**MORGAN, LEWIS & BOCKIUS LLP**
502 Carnegie Center
609-919-6696 (Telephone)
609-919-6701 (Fax)
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

DAVID SELLERS,

        **Plaintiff,**

        **v.**

ROYAL BANK OF CANADA, RBC USA
HOLDCO CORPORATION, RBC
CAPITAL MARKETS CORPORATION,
LLC, and JOHN DOES 1-5,

        Defendants.

------------------------------------ X

Case No. 12-Civ-1577 (KBF)
ECF

### AFFIDAVIT OF AUGUST W. HECKMAN III

    I, AUGUST W. HECKMAN III, ESQ., declare under penalty of perjury as follows:

    1.    I am an associate with the law firm of Morgan, Lewis & Bockius LLP, attorneys for Defendants in the above-captioned case. I submit this Declaration in support of Defendants' motion for summary judgment under Fed. R. Civ. P. 56.

    2.    Attached hereto as Exhibit A is a true and correct copy of relevant excerpts from the October 10, 2013 deposition transcript of Plaintiff David Sellers ("Plaintiff").

    3.    Attached hereto as Exhibit B is a true and correct copy of Plaintiff's LinkedIn profile page referenced during his deposition, accessed and printed on October 25, 2013.

    4.    Attached hereto as Exhibit C is a true and correct copy of the August 7, 2006 Consulting Agreement entered into between Risk Management Consulting Services ("RMCS")

and RBC, which was executed by Plaintiff on behalf of RMCS, to provide consulting services to RBC Group Risk Management.[1]

5.      Attached hereto as Exhibits D through J are true and correct copies of the Group Risk Management Consulting Agreement addendums.

6.      Attached hereto as Exhibit K is a true and correct copy of the February 1, 2008 addendum to the RMCS/RBC Consulting Agreement, under which RMCS provided services to RBC Corporate Banking.

7.      Attached hereto as Exhibit L is a true and correct copy of the February 12, 2008 email correspondence from Plaintiff to Christian Brune.

8.      Attached hereto as Exhibit M is a true and correct copy of the January 21, 2008 email correspondence from Plaintiff to Stephen Walker.

9.      Attached hereto as Exhibits N through R are true and correct copies of the Corporate Banking Consulting Agreement addendums.

10.     Attached hereto as Exhibit S is a true and correct copy of the April 27, 2008 email correspondence between Plaintiff and RBC with attached redlined Agreement For Consulting Services.

11.     Attached hereto as Exhibit T is a true and correct copy of the Partially Executed Credit Suisse Consulting Agreement and Related Documents Produced by Plaintiff.[2]

12.     Attached hereto as Exhibit U is a true and correct copy of the Fully-Executed Sellers/Credit Suisse Consulting Agreement, with attachments.

13.     Attached hereto as Exhibit V is a true and correct copy of the relevant portions of Plaintiff's Interrogatory Responses.

---

[1] The remaining documents attached hereto were produced by the parties during discovery.

[2] Plaintiff did not bates-label his document production.

14.     Attached hereto as Exhibit W is a true and correct copy of the RMCS Invoice to Credit Suisse produced by Plaintiff.

15.     Attached hereto as Exhibit X is a true and correct copy of the Credit Suisse Disbursement Voucher to RMCS produced by Credit Suisse.

16.     Attached hereto as Exhibit Y is a true and correct copy of the October 11, 2008 letter from RMCS to Credit Suisse.

17.     Attached hereto as Exhibit Z is a true and correct copy of Plaintiff's federal tax records for the years 2008, 2009, 2011 and 2012 produced by Plaintiff.[3]  These documents are being submitted with Defendants' October 25, 2013 Motion to File Documents Under Seal.

18.     Attached hereto as Exhibit AA is a true and correct copy of the October 30, 2008 email correspondence from Plaintiff to Jake Sigmund.

19.     Attached hereto as Exhibit BB is a true and correct copy of the February 11, 2009 email correspondence from Plaintiff to J. Sigmund.

20.     Attached hereto as Exhibit CC is a true and correct copy of the February 11, 2009 email correspondence from Plaintiff to Christian Brune.

21.     Attached hereto as Exhibit DD is a true and correct copy of the August 16, 2013 Response from the New York State Department of Labor to a Freedom of Information Law Request.

22.     Attached hereto as Exhibit EE is a true and correct copy of Plaintiff's December 8, 2009 Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

---

[3]     Plaintiff did not produce federal tax records for the year 2010.  Defendants renewed their request for production of these records during Plaintiff's October 10, 2013 deposition. Plaintiff has not yet produced them.

23.     Attached hereto as Exhibit FF is a true and correct copy of the February 5, 2010 letter from RBC to RMCS.

24.     Attached hereto as Exhibit GG is a true and correct copy of the June 28, 2011 letter from RBC to the EEOC.

25.     Attached hereto as Exhibit HH is a true and correct copy of the November 21, 2011 Notice of Right to Sue letter issued by the EEOC to Plaintiff.

26.     Attached hereto as Exhibit II is a true and correct copy of the February 15, 2012 Tolling Agreement entered into between Plaintiff and RBC.

27.     Attached hereto as Exhibit JJ are true and correct copies of the Independent Contractor Letter Agreements between Plaintiff and the Lewis Center For Visual Arts at Princeton University.

28.     Attached hereto as Exhibit KK are true and correct copies of Plaintiff's IRS Form 1099's from Princeton University for the years 2010 to 2012.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Dated:  October 25, 2013.

August W. Heckman III, Esq.

4

# EXHIBIT A

Page 1

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
                    CASE NO. 12-Civ-1577 (KBF) ECF


     DAVID SELLERS,

                    Plaintiff,

              vs.

     ROYAL BANK OF CANADA;
     RBC USA HOLDCO CORPORATION,
     RBC CAPITAL MARKETS
     CORPORATION, LLC, and
     JOHN DOES 1-5,

                    Defendants.


                    ------------
              Thursday, October 10, 2013
                    ------------


         Oral sworn videotaped deposition of DAVID
     SELLERS, taken at the law offices of Morgan, Lewis &
     Bockius, LLP, 502 Carnegie Center, Princeton, New
     Jersey, on the above date, commencing at 10:03 a.m.,
     there being present:


                    - - - - - -


                    TATE & TATE
                 Certified Court Reporters
                180 Tuckerton Road - Suite 5
                Medford, New Jersey  08055
                (856) 983-8484 - (800) 636-8283
                    www.tate-tate.com

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.              Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers          October 10, 2013

Page 32

 1    Q.         Umm-hmm.

 2    A.         **And that is, too, that, you know, when you**

 3    **have a lot of experience, that experience implies**

 4    **age.  You've been around for a long time, in my case**

 5    **anyway, I would look at my resume and I gained that**

 6    **experience over time and therefore, therefore, I was**

 7    **older.  So age --**

 8    Q.         And with experience not only comes the

 9    passage of time, but comes an increased amount of

10    compensation, correct?  In other words, someone

11    who's more experienced?

12    A.         **God willing.**

13    Q.         Right.  Okay.

14    A.         **God willing.**

15    Q.         You -- so my question really though was

16    this.  While working, and I understand that you're

17    testifying you had a general concern about what your

18    age was at the time, in 2008, how old would you have

19    been or how old were you?

20    A.         **2008, I would say 56.**

21    Q.         56, okay.

22    A.         **You know, it depends on where in 2008 of**

23    **course.**

24    Q.         When's your birthday?

25    A.         **August 14th.**

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 33

1    Q.        What year?

2    **A.        '52.**

3    Q.        My question is while you're there, while

4    you're at RBC, not afterwards looking backwards,

5    while you're there, did any event happen that caused

6    you to think I'm being discriminated against because

7    of my age, not I'm concerned about my age in general

8    in the market?

9    **A.        Any single event, I would say no.**

10   Q.        Okay.

11   **A.        And I would say that the subsequent events**

12   **would have served to dispel, in fact, any concerns**

13   **that I had about age.  Now, right or wrong, I -- and**

14   **perhaps I was a bit generous in interpreting events**

15   **in favor of RBC at the time, but, you know, I would**

16   **say that subsequent events tended to allay my**

17   **concerns.**

18            **I'm tilting here.  Is that okay?**

19   Q.        We'll get to that in a second, but I don't

20   want to get too far off.

21   **A.        That's fine.**

22   Q.        You mentioned your general concerns about

23   your age and the marketplace and you said something

24   along the lines of in that market in particular, so

25   in 2008, the market, can you just describe for me,

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF      Videotape Deposition of David Sellers      October 10, 2013

Page 40

1    authority to commit the bank's balance sheet?

2    A.        Did I have the authority to commit the

3    bank's balance sheet?  That's a trick question,

4    isn't it?

5    Q.        It is?  I don't know.  Is it?

6    A.        Yeah, it's a trick question.

7    Q.        Why is it a trick question?

8    A.        Because -- because it's one of the very few

9    things that given the fact that my employment

10   relationship was not regularized that the bank could

11   not give me.  A corporate banking officer normally

12   has some authority, depending on what their rank is

13   within the institution, has some authority to commit

14   the bank's balance sheet.  However, I was in this

15   awkward position where I was -- and this is a

16   disputed point -- that I was acting in all respects

17   as a corporate banking officer, but still with --

18   under a contract as an independent contractor.  And

19   there were limits in -- you know, I'm sure

20   ultimately imposed by regulations and the law

21   generally with respect to banking, to how much I

22   could perform as a corporate banker, and one of the

23   very few limits that was there was -- had to do

24   with -- with lending authority.  Now, having said

25   that --

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 41

1  Q.      Well, what --

2  A.      No, go ahead.  I'm sorry.  Go ahead.

3  Q.      What were the other limits?

4  A.      No flu shot.  Sorry.

5  Q.      That's okay.

6  A.      It's true, no flu shots for independent

7  contractors.  I could have fought for it, but I

8  didn't.

9  Q.      Did that fall in line with other typical HR

10 type benefits that are available for the regularized

11 employees --

12 A.      Oh, absolutely.

13 Q.      -- that you referred to?

14 A.      Yeah, but I mean, I'm being somewhat

15 facetious --

16 Q.      Right.

17 A.      -- with saying the flu shots.  But, yeah,

18 needless to say, the other benefits that are

19 available to employees who are -- who have I'm going

20 to for want of a better phrase I'm going to say

21 whose relationship is regularized --

22 Q.      Okay.

23 A.      -- the bank couldn't give me a business

24 card that said David Sellers because I didn't have a

25 regularized title.  So --

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.              Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers       October 10, 2013

Page 43

1    across the board, in terms of my interactions and

2    access to internal and external constituencies of

3    the bank, there was no distinction between -- none

4    that I could perceive between myself and a regular

5    employee.

6    Q.      Was the access to those systems and those

7    interactions both external and internal, were

8    they --

9    A.      Yeah.

10   Q.      -- necessary for you to perform the

11   projects or duties and responsibilities for which

12   you were engaged?

13   A.      Absolutely, my assignments we'll call them,

14   shall we?

15   Q.      Okay.  Good.  Assignments.

16   A.      My assignments and responsibilities, yes.

17   Q.      Who introduced you to external clients?

18   A.      Let me think about that.

19   Q.      And these questions --

20   A.      Yeah.

21   Q.      -- are all geared towards the time period

22   in which you're working for corporate banking --

23   A.      Understood, understood.

24   Q.      -- or performing services for corporate

25   banking.

USDC, SD of NY                 Sellers v. Royal Bank of Canada, et al.            Thursday
No. 12-Civ-1577 (KBF) ECF      Videotape Deposition of David Sellers         October 10, 2013

Page 51

```
 1    Q.        So we know it's California, what other

 2   clients, external clients would you have interacted

 3   with besides officials from California?

 4    A.        Well, again, depending -- it's transaction

 5   driven, it's deal driven.

 6    Q.        Okay.

 7    A.        So each transaction has its own deal team

 8   and each deal team is going to include individual

 9   clients, individuals representing the clients.

10             So, for example, there was a financing that

11   I was involved with for the school district of

12   Pembroke Pines, don't quote me on that, I forget the

13   exact name of the issuer, but there would have been

14   individuals who really led their deal team who

15   represented the county or the City of Richmond.

16    Q.        And what I'm looking for --

17    A.        Sure.

18    Q.        -- would be the city of Pembroke Pines --

19    A.        Right.

20    Q.        -- so let me try this a different way.

21    A.        Yeah, go ahead, yeah.

22    Q.        Do you recall working for well, one, the

23   city of Pembroke Pines, that being one of the

24   clients?

25    A.        I'm pretty sure it was the city of Pembroke
```

Page 52

```
 1    Pines --

 2    Q.        Okay.

 3    A.        -- but I'm not sure of the exact name.

 4    Q.        Then do we have -- do you recall working on

 5    assignments for the Richmond Community Youth

 6    Development Agency?

 7    A.        Absolutely, absolutely.

 8    Q.        Okay.  Do you recall working on assignments

 9    for the City of Port Saint Lucie?

10    A.        Yes, yes.

11    Q.        Do you recall working on assignments for

12    New Mexico Energy?

13    A.        New Mexico Municipal Electric Energy

14    Authority or something -- energy authority, yes.

15    Q.        Okay.  And is this part of something --

16    A.        NMMEA.

17    Q.        I'm sorry?

18    A.        NMMEA.  So if you fill in the rest of it,

19    you'll get it right.

20    Q.        We could tease that out.

21    A.        Okay.

22    Q.        Would that have been part of work on

23    something referred to as prepaid gas?

24    A.        It would.

25    Q.        Okay.  Was there other work or assignments
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 53

1    involved under the umbrella of prepaid gas?

2    **A.       Yes.**

3    Q.       Okay.

4    **A.       There were.**

5    Q.       Is that -- sounds to me like that could be

6    a sort of a subgroup of a way to characterize a

7    certain group of transactions or deals?

8    **A.       That's correct.  I think that's fair to**

9    **say.**

10   Q.       How would you then characterize, if there

11   is one, the work that was performed for California?

12   **A.       In comparison would you say?**

13   Q.       So in other words --

14   **A.       Yeah.**

15   Q.       -- the New Mexico Energy, NM whatever it

16   is, right?

17   **A.       Right, right.**

18   Q.       That falls under the umbrella of prepaid

19   gas?

20   **A.       Umm-hmm.**

21   Q.       Is there an umbrella for which your

22   assignments for California would fall under?

23   **A.       Well, yeah, I would say the umbrella would**

24   **be state commercial paper programs.**

25   Q.       Fine.  Okay.

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 54

1    A.        You know, I mean that's the nature of that

2    financing.

3    Q.        Do you recall assignments related to UPMC?

4    A.        Yes, yes, I do.

5    Q.        Do you recall what UPMC stands for?

6    A.        University of Pittsburgh Medical Center.

7              MR. HECKMAN:  I'm taking you down to

8    the wire.

9    Q.        Do you recall assignments related to

10   Lancaster?

11   A.        Yes, that would fall under prepaid gas.

12   Q.        Prepaid gas.

13             Okay.

14             Okay.  We're going to take a break because

15   we have to switch the videotape.

16   A.        You've got to change the film.

17   Q.        Right.  And we might as well take a few

18   minutes, we can use the restroom and you can have

19   some of your tea.

20   A.        I'm good.  Yeah, I'll just sip some tea.

21             MR. HECKMAN:  Okay.

22             THE VIDEOGRAPHER:  We've reached the

23   end of tape number one.  We're now going off the

24   record.  The time is eleven o'clock a.m.

25             (Recess taken.)

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 55

```
 1              THE VIDEOGRAPHER:  This is the

 2   beginning of tape number two.  We're now back on the

 3   record.  The time is 11:22 a.m.

 4   BY MR. HECKMAN:

 5   Q.        Okay.  Mr. Sellers, I believe we left off,

 6   I was asking you questions about specific clients --

 7   A.        Yes.

 8   Q.        -- that you would have interacted with

 9   while in corporate banking.  Do you remember that?

10   A.        Yes.

11   Q.        Okay.  And hopefully we don't have to

12   repeat the entire list of clients.  My question to

13   you-- but I will, if you need to -- my question to

14   you is other than those specific assignments or

15   clients that we discussed before the break, can you

16   recall working on any other assignments for other

17   clients?

18   A.        Yes.  One in particular.

19   Q.        And which is that?

20   A.        That would be the City of Harrisburg, and

21   what I'm not completely sure of whether that -- the

22   City itself was the client or whether it was the

23   incinerator authority, but it doesn't matter.

24   They're -- they -- talk about hand in glove,

25   unfortunately, I'm sure the City of Harrisburg
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 58

1    might be working on something because things evolve,

2    you get on conference calls.

3    Q.        Meaning you don't know which particular

4    deal you might be working on at any given moment,

5    but you would have a general understanding of what

6    deals you're working on?

7    A.        Well, no, that's not really true.  I mean,

8    you're working on transactions, you're part of a

9    team, you know what your place is in that team and,

10   you know, when you come in on any given day you know

11   you've got some things you've got to accomplish.

12   But, you know, you can be pulled into a conference

13   call, you can be pulled into a meeting, etcetera,

14   etcetera.  There's -- it's sort of the give and take

15   of any corporate officer in an office.

16   Q.        And you mentioned you would know what your

17   place was on the team.  Did your place on the team

18   differ depending on the team or did you for the most

19   part play the same role across the different deals?

20   A.        Well, a corporate banking officer is

21   generally, again, generally doing the same thing,

22   but it does vary to some extent according to the

23   transaction.  The role in the state of California

24   is -- well, it's the same as the other transactions

25   insofar as at the level that you're -- you're making

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 59

```
 1    recommendations, you're structuring a transaction
 2    from the corporate banking side, you're structuring
 3    that transaction from that corporate banking side,
 4    you're -- in so doing, you're working with all the
 5    parties on the team, but the parties on the team are
 6    going to be different, it's very different for the
 7    state of California compared to a prepaid gas
 8    transaction, compared to the Richmond Redevelopment
 9    Authority.  And so depending on the team, the
10    transaction, exactly what you're doing is -- it's
11    going to differ, it's transaction driven, it's not
12    cookie cutter.
13    Q.       Yeah, and I understand that.  Maybe there's
14    a better way to --
15    A.       Okay.
16    Q.       -- get to --
17    A.       Yeah, feel free.
18    Q.       -- where I think I'm trying to go to here,
19    which is what you personally brought to the table
20    for these deals for your role in the deals.  So not
21    so much as what does generally a corporate banking
22    officer do, but more what were you bringing to the
23    situation.  And you've referenced a couple of times
24    your experience.
25    A.       Yeah.
```

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers        October 10, 2013

Page 76

```
 1    A.        Yeah.

 2    Q.        -- it's not as if he's standing over your

 3    shoulder watching you do what you do or maybe he is.

 4    I don't know.  That's what I'm trying to get a sense

 5    of, you know.

 6    A.        Okay.  No.  Well, I see where you're going

 7    on that.

 8              Depending on the transaction -- okay.

 9    Let's step back for a second and remember that I

10    think it's safe to say at that time, I was a

11    relatively highly experienced municipal finance

12    banker.  Pat Shields was not a municipal finance

13    banker, he was a corporate banker and as such he had

14    his specialties in the corporate world, but he was

15    not a municipal finance -- public finance banker.

16    Okay.  Ergo, I was entrusted to operate with a

17    degree of independence and responsibility for my

18    accounts.  That's why really as I said they needed

19    an experienced banker there.  However, at critical

20    times in a transaction, California being an

21    example -- oh --

22    Q.        Go ahead.  I'll hit the switch.

23    A.        Is this a good opportunity for me to visit

24    the men's room?  Is that okay or no?

25    Q.        Let's just finish the thing out.  I just
```

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers               October 10, 2013

Page 80

1              So, you know, there was no difference to

2    the extent that still Jake as the manager of the

3    team would come to me just as Alex would have come

4    to me to say I've got this transaction, let's talk,

5    can we talk about it, is -- it's with everything

6    else that you've got going on, can you take it on.

7    And that conversation would be the same.

8              Given my experience, I would make a point

9    to treat Jake the same way I would treat Alex

10   because he's in the same position.  I undoubtedly

11   had to do a little bit more hand holding and explain

12   things maybe a little more detail, maybe he would

13   ask more questions.  So you see, yes and no or no

14   and yes the way I presented it to you.

15   Q.        Did you think Mr. Sigmund was qualified for

16   the manager position?

17   A.        No.

18   Q.        Why not?

19   A.        Well, because he didn't have the depth of

20   experience in municipal finance for a portfolio of

21   that size and, you know, in my -- I've managed,

22   before RBC I've managed a team of bankers doing --

23   with a similar responsibility for a portfolio, an

24   even broader based portfolio in terms of types of

25   transactions and I was in various positions where I

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF      Videotape Deposition of David Sellers        October 10, 2013

Page 81

```
 1    hired bankers to join a team, more junior bankers,

 2    and so I was in a position where I wrote -- you

 3    know, every now and then I had to write a job

 4    description, a job posting.  And it's not hard --

 5    having that experience, it's not hard to imagine

 6    that you say to yourself, what would be the

 7    qualifications for somebody in that position.  And

 8    Jake Sigmund would not, would not be a logical

 9    candidate in that -- for that position plain and

10    simple.

11    Q.      Do you know who made the decision to bring

12    Jake Sigmund into that position?

13    A.      No.

14    Q.      Do you know who made the decision to remove

15    Mr. Birr from that position?

16    A.      No.

17    Q.      Mr. Sigmund followed Mr. Birr, right?

18    A.      That's exactly right.

19    Q.      You mentioned that Mr. Sigmund had a very

20    narrow specialist or specialism --

21    A.      Specialty.

22    Q.      Specialty?  That's it.

23    A.      Yes, yes.

24    Q.      Could you explain what you meant by that?

25    A.      Real estate.
```

USDC, SD of NY     Sellers v. Royal Bank of Canada, et al.     Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers     October 10, 2013

Page 91

1    Birr did not require -- Mr. Birr was not like a

2    sponge, he had the knowledge?

3    A.       Yeah, but Alex too would come to me too

4    because he didn't have the experience that I had.

5    Q.       All right.

6    A.       And, in fact, before I formally started in

7    corporate banking, I wrote a sort of a quick and

8    dirty assessment of something for Alex, and it might

9    have been prepaid gas.  Alex I think was working on

10    one of the first prepaid gas.

11          Now, I didn't have experience in prepaid

12    gas, but Alex was looking for a second opinion

13    because he was on the line to write something,

14    produce something.  And I, again, drawing upon a

15    breadth and depth of experience, said, Alex, I'm --

16    I would be worried about this, I would look into

17    that more.

18          I think it was prepaid gas.  I'm not a

19    hundred percent sure of that, but I remember that

20    that was something that in a way I sort of

21    volunteered to do because I -- my -- because I

22    hadn't actually started in corporate banking, I was

23    finishing up in group risk, but I had some capacity,

24    I said I'll do this to help the guy out.

25    Q.       How did what you -- am I correct in

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 92

```
 1    understanding when I read the Amended Complaint that

 2    you are not contending that your time with group

 3    risk as an independent contractor was anything other

 4    than as an independent contractor; is that correct?

 5    A.        Correct.

 6    Q.        Okay.  And we can get to the details later,

 7    but we have an independent contractor agreement

 8    during your time in corporate banking, but despite

 9    that agreement, your contention is you were really

10    an employee --

11    A.        Yes.

12    Q.        Is that correct?

13              So what differed between your time in group

14    risk and your time in corporate banking that leads

15    you to the conclusion that you were an employee and

16    not an independent contractor?

17    A.        Many things differed and we know the devil

18    is in the details.  You know in the Amended

19    Complaint, I state a number of indicia if I can say

20    that, if I'm saying that right, of employment that I

21    believe clearly applied in my case in corporate

22    banking, but did not apply when I was in group risk.

23              But let me try to sum it up.  In group

24    risk, it was clearly project that I was working on.

25    And there are a lot of ways of defining what -- I'm
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 93

```
 1     sure what means a project and I guess we could

 2     probably spend a few hours debating what's a

 3     project.  But let me try to sum it up in at least

 4     one way and that is a project is something that the

 5     regular employees within group risk would not do,

 6     could not do and/or would not do because their

 7     regular responsibilities and their -- yeah, their

 8     regular responsibilities to start with would

 9     preclude them from doing that.  It's beyond their

10     regular responsibilities, it requires a kind of --

11     it's a project.  It requires a kind of dedication to

12     a specific thing that is not part of their job

13     description.  And so that's a project.

14            By no stretch -- this is a gratuitous

15     comment -- but by no stretch is what I did in

16     corporate banking a project, it is -- it is exactly

17     what a corporate banker as an employee does.  And I

18     say that from my experience as a corporate banker in

19     other large banks doing the same kind of business.

20     It's not project oriented.  You can isolate a deal

21     and you can call it a project if you want, but it's

22     not going to make it a project.

23            I mean, there are certain things that

24     are -- are the basic responsibilities and reflect

25     the basic assignments of a corporate banker.  Do
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 94

```
 1    corporate bankers work on projects?  Yes, they do.

 2    Do independent contractors do the work of corporate

 3    bankers?  Hmm, they probably shouldn't do that, not

 4    really, they shouldn't do it, as I came to

 5    subsequently understand.

 6    Q.      You say they shouldn't do it.  Why

 7    shouldn't they do it?

 8    A.      Well, because there's a point when an

 9    independent contractor crosses the line and becomes

10    an employee.  In that sense they shouldn't do it.

11            You know, let me -- can I -- let me make

12    the banal comment, if it looks like a duck and it

13    quacks like a duck and, you know, and it walks like

14    a duck, it probably is a duck.  I'm sorry, but allow

15    me to make that.

16    Q.      No.  That's all right.

17    A.      But it applies -- it applies.  And anybody

18    who knows what corporate banking and what corporate

19    bankers do and they look at the transactions that I

20    worked on and said, okay, is this the work of

21    corporate banking or is this the work of an

22    independent contractor, I'm pretty confident they

23    would say it's the work of a corporate banker.  And

24    that's summing up and generalizing all those little

25    indicia that we might look at.
```

USDC, SD of NY                                                                    Thursday
No. 12-Civ-1577 (KBF) ECF        Sellers v. Royal Bank of Canada, et al.     October 10, 2013
                                 Videotape Deposition of David Sellers

Page 95

1    Q.        So in your mind or in your theory and your

2    explanation, what you've just described to me, if

3    your work in corporate banking was more project

4    orientated, you would not have considered yourself

5    an employee?

6    **A.        Yeah, of course, of course.  We wouldn't be**

7    **sitting here.**

8    Q.        It's our five-minute warning.

9              In your experience as a corporate banker,

10   so prior to --

11   **A.        Yes.**

12   Q.        -- your engagements at RBC, had you ever

13   worked with an independent contractor?

14   **A.        Yes, umm-hmm.**

15   Q.        And were those -- your experience in

16   observing those other independent contractors' work,

17   were they working solely on the types of projects,

18   quote-unquote, that you've described?

19   **A.        Honestly, I can think of one example that**

20   **was clearly a project.**

21   Q.        That was clearly a project?

22   **A.        No mistake about it.**

23   Q.        Have you in your personal experience ever

24   come across an independent contractor engaged to

25   work on a -- something other than what you would

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF    Videotape Deposition of David Sellers         October 10, 2013

Page 98

```
 1      I point out that the bank, the defendants, Patrick

 2      Shields in particular --

 3      Q.      And Mr. Shields is not a named defendant

 4      though, correct?

 5      A.      That's correct.  You are correct.

 6              Should I refer to -- can I refer to Mr.

 7      Shields or should I refer to the defendants?  It

 8      depends on the context.

 9      Q.      Well, I think it depends on the context.

10      A.      Okay.  Correct me if I get it wrong.

11      Q.      Okay.

12      A.      It was Mr. Shields in particular who is, of

13      course, a member of the bank, an employee of the

14      bank had represented to me from the outset that I

15      would be hired as a regular employee and that I

16      would be valued for my expertise and my depth and

17      breadth of experience, etcetera, etcetera.  And that

18      initially for reasons that are -- that I go into

19      detail in the Amended Complaint about, that I would

20      not be -- I could not be hired as a regular employee

21      at the very beginning, however, in the interest of

22      filling their need to have an experienced person

23      there and in the interests -- in my interest of

24      having a, quote-unquote, seamless transition that I

25      would -- a way would be found I should say to -- for
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 99

1    me to start working right away after my contract

2    ended with group risk, to start working right away

3    in corporate banking.

4              But, explicitly, it was explicit that it

5    was just a matter of time, believed to be within

6    that first contract period and I believe as I recall

7    initially discussed to be within a matter of weeks

8    that my employment would be regularized.  I remember

9    specifically talking about how if the contract term

10   was three months, how if the okay -- the go aheads

11   and the green lights were all given short of that

12   period of time, how would that -- how would that

13   contract term affect it and, of course, we could

14   just agree to tear it up and throw it out.

15   Q.        And these were discussions with?

16   A.        Patrick Shields.

17   Q.        Patrick Shields.

18             Was anyone else involved in these

19   discussions?

20   A.        I'm trying to remember if Steven Walker was

21   part of those -- I don't believe Steven Walker was

22   part of those discussions, but I can't recall that.

23   We certainly talked about how we would proceed and

24   the possibility at that point with Steven Walker,

25   the possibility that a contract might be needed to

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 104

1    had as large of a -- I don't believe he had as large

2    of a diversified portfolio -- although frankly I

3    can't -- I'm not qualified to speak to Jake Sigmund

4    responsibilities before.

5    Q.      Are you aware of whether or not there was a

6    freeze, like a budget freeze put in place on

7    full-time equivalence --

8    A.      No.

9    Q.      -- at this time?

10   A.      No.

11   Q.      So then my question is did anyone discuss

12   with you the reasons why Jake was brought in to

13   replace Mr. Birr?

14   A.      No.

15   Q.      Okay.  So continue.  I didn't want to --

16   A.      Yep.  So as -- again, as time went on --

17   Q.      In fact, I'm sorry.  I'll cut you off.

18   A.      Go ahead, go ahead, go ahead.  That's okay.

19   Q.      Did you approach Mr. Shields about the

20   hiring of Mr. Sigmund?

21   A.      Yes.

22   Q.      Okay.

23   A.      Well, I asked the question --

24   Q.      Okay.

25   A.      -- you know, what does this mean for me.

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF         Videotape Deposition of David Sellers               October 10, 2013

Page 107

1    Q.       Yes.

2    A.       And in the situation I was in, and indeed

3    from the very beginning in the discussions with

4    corporate banking before I started in corporate

5    banking, it's needless to say that there's a certain

6    amount of trust that's required on both parties.

7    And as we moved through time in corporate banking

8    and I would ask that question, are we on plan, are

9    we on track, you know, I had to -- I felt like I

10   needed to be careful to not suggest that there was

11   anything less than trust.  We were co-workers.  We

12   worked together very closely.

13           So did I ever say what the hell, I mean,

14   why wasn't I hired for that position?  No.  All I

15   needed to know was from my supervisor, Pat Shields,

16   that we were still on plan for a permanent position.

17   For all I knew, if somebody like Jake Sigmund with

18   his experience was hired into that position, it

19   could be that the bank had an even more senior

20   position in mind for me.

21   Q.       And nobody --

22   A.       That's what I was waiting for, so....

23   Q.       And nobody told you that specifically?

24   A.       Absolutely not.

25           So but what I'm saying is therefore, you

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers          October 10, 2013

Page 108

1      know, the question pressing that point too hard at

2      that point seemed to me to be impolitic for right or

3      wrong and certainly could -- I ran the risk of

4      suggesting that there was less than complete trust

5      on my part.

6      Q.        Okay.

7      A.        And I had no reason to do that.

8      Q.        After Mr. Sigmund was brought on board --

9      A.        Yes.

10     Q.        -- were there any open positions that were

11     ever posted in the municipal finance or corporate

12     banking group that you could have applied to?

13     A.        No, no.

14     Q.        Did you ever, in fact, apply for a position

15     after Mr. Sigmund was brought on board?

16     A.        Let me point something out.  Okay.  The

17     municipal finance team is very small and I am --

18     although within that space, I have broad experience,

19     it still was within the municipal finance arena, and

20     at my level, the appropriate position would have

21     been the head of that group or if the bank created

22     some other separate position that was -- was

23     appropriate for my level of experience, then it

24     would have been something that no doubt I would have

25     applied for.

Page 109

```
 1    Q.        Was that appropriate position other than

 2    the one filled by Mr. Sigmund ever created while you

 3    were there?

 4    A.        Not that I'm aware of.

 5    Q.        Okay.  So back to the beginning of this

 6    line of questioning --

 7    A.        Yeah.

 8    Q.        -- which was connecting the dots --

 9    A.        Yeah.

10    Q.        -- all right --

11    A.        Yes, right.

12    Q.        -- to use your phrasing, what were the

13    dots?

14    A.        Well, the dots were the repeated

15    representations that I would be hired into a

16    permanent position, an appropriate permanent

17    position and the fact that that continued -- that

18    was -- that never happened over -- over several

19    extensions of the contract, the fact that a person

20    in his 50s was let go, a much younger person was --

21    replaced him in his position --

22    Q.        In that respect, you're referring to Mr.

23    Birr and Mr. Sigmund?

24    A.        Absolutely.

25    Q.        Okay.
```

Page 110

1   A.        Okay.  At one point, and again, the -- the

2   import of it certainly wasn't immediately apparent

3   to me, but when Pat Shields informed me that, in

4   fact, my -- the contract that I was in would be

5   my -- at that time in February -- January, February,

6   I forget exactly when, would not be extended and I

7   asked why and he -- his answer was that the bank had

8   decided instead to hire more junior people.

9   Q.        Do you remember exactly what he said?

10  A.        That's pretty much it, he would -- the bank

11  would be hiring more junior people.

12  Q.        Did he use the phrase "junior people?"

13  A.        Yes, yes, he did use the phrase "junior

14  people."

15  Q.        And at the time, what did you understand

16  that to mean?

17  A.        Well, junior people means several things.

18  I mean, if I can tell you exactly -- I couldn't tell

19  you exactly how I reacted, but junior people

20  certainly implied to me younger people.  In theory

21  they could hire somebody older than me who is, in

22  fact, junior, but that would not be likely.

23            Junior people, if we're going to speak

24  realistically, implies a younger person than me.

25  Q.        Let's back up one second.

Page 116

1   **and the compensation that would presumably reflect**

2   **the level of responsibility, etcetera, etcetera.**

3   Q.        In theory then, even an associate position

4   for some reason had with it the responsibilities

5   commensurate with what you would have been expecting

6   but was only compensated at a traditional associate

7   level would not have been an appropriate position

8   for you.  I'm not saying one existed, I'm trying to

9   figure out --

10  A.        **This is getting way too hypothetical.**

11  Q.        -- that scale.

12  A.        **This is way, way too hypothetical.**

13  Q.        What type of compensation package would you

14  have expected or considered to be appropriate in

15  2008?

16  A.        **Well, I know what the bank was paying me at**

17  **that time to do what I was doing.**

18  Q.        Right.

19  A.        **And if they were going to pay me to**

20  **continue to do that type of work or maybe even give**

21  **me more responsibility, that would be a frame of**

22  **reference, a frame of reference.**

23  Q.        Would you have accepted less compensation?

24  A.        **I would have certainly considered less**

25  **compensation.  I would have considered it.  My**

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 117

1    interest being -- as you know, it's not just a

2    question of title and it's not just a question of

3    compensation, it's a question of managing one's

4    career and making sure that the decision makes sense

5    in terms of where you are in your career.  And I

6    believe up to that point, I'd managed my career

7    carefully enough that I was either assuming more

8    responsibility with each move or I was diversifying

9    my responsibility, which in the long run could be

10   helpful.

11           So the question of what makes a position

12   acceptable or unacceptable is a function of all of

13   those things, not just simply title, not just simply

14   compensation.

15   Q.       But the ultimate goal to move your career

16   at least laterally or forward, but certainly not

17   backwards?

18   A.       Naturally.

19   Q.       Right.  Okay.  I think I get it.

20           Are there any other dots, when I asked you

21   what were the dots and we've talked about, we've

22   enumerated several dots.  Are there any other dots?

23   A.       The intangible dot.  Okay.

24   Q.       The ever illusive intangible dot.

25   A.       The intangible -- yeah, I have to say no,

Page 119

1    that indicate that are not.

2    Q.        Umm-hmm.

3              Any other dots?  We'll continue with the

4    analogy?

5    A.        Not that I can think of.  If I think of any

6    others, I'll mention them.

7    Q.        Are you seeking emotional distress damages

8    in this lawsuit?

9    A.        Yes.

10   Q.        What emotional distress are you suffering?

11   A.        Well, when you lose your job and your

12   career is ended, all right, and you lose your

13   primary source of income, and you then, in order to

14   pay your bills, have to draw down your retirement

15   funds and, you know, and you have all the financial

16   stress that is -- goes along with that, that by

17   definition causes emotional distress as implications

18   for your family, for you and for your family.

19   Q.        How has your emotional distress manifested

20   itself?

21   A.        I'm not sure what you're asking me.

22   Q.        I'm asking you for a manifestation of your

23   emotional distress, how is it affecting you

24   physically or mentally.

25   A.        Well, living with stress, financial stress

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers               October 10, 2013

Page 120

1    all the time --

2    Q.        Okay.

3    A.        -- figuring out how to pay bills, monthly

4    bills, figuring out how to pay a mortgage, figuring

5    out how to make the property tax payment quarterly

6    that comes up, unfortunately, New Jersey's pretty

7    high property tax.  Lucky the folks in Pennsylvania.

8    Q.        Have you sought medical treatment for your

9    emotional distress?

10   A.        The answer's no.

11   Q.        When did the emotional distress begin?

12   A.        I would say fairly early on when I

13   recognized the -- the difficult position that I was

14   being put into.  And by that I mean that I was led

15   to believe that I had a -- had some -- had security

16   as it were in the form of a regular position with

17   RBC, reinforced by a lot of things, some of which

18   we've touched on.  And then to, you know, to

19   describe -- to put it this way might be best and

20   that is to have the rug pulled out from underneath

21   you and to find yourself at my age at that time in a

22   not exactly the best market.  You know, you didn't

23   have to be -- have to be in that position before to

24   realize it was a very bad position to be in and I

25   would say that distress started pretty early on --

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 138

1    Jersey?

2    **A.       Yes.**

3    Q.       And then did you have any engagements with

4    Risk Management prior to your engagement by RBC in

5    their --

6    **A.       Group risk.**

7    Q.       -- group risk?

8    **A.       No.**

9    Q.       Since your engagement or Risk Management's

10   engagement with corporate banking, has Risk

11   Management had any other engagements?

12   **A.       No.**

13   Q.       During the time that Risk Management was

14   engaged by corporate banking, there was also an

15   engagement of Risk Management by Credit Suisse?

16   **A.       Securities.**

17   Q.       Securities.

18   **A.       Exactly, yes.**

19   Q.       Approximately how long was that engagement?

20   **A.       I'll tell you exactly how long it was.**

21   **Three months.**

22   Q.       Three months.

23   **A.       It was a three months contract.**

24   Q.       And during those three months, Risk

25   Management was also engaged my RBC corporate

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 139

1    banking?

2    **A.       Yes, yes.**

3    Q.       Other than during that time period of 2008

4    while you were engaged and early '09 while you were

5    engaged -- while Risk Management's engaged by RBC

6    corporate banking, other than Credit Suisse is there

7    any other entities that engaged Risk Management?

8    **A.       No.**

9    Q.       Okay.  Do you still hold Risk Management

10   out as an entity to be engaged?

11   **A.       It exists to the extent an opportunity**

12   **would come along.  The problem I described for**

13   **employment, I really -- you know, to be honest with**

14   **you, I was referring more generally in finding**

15   **relevant work.  I mean, I would take work now as I**

16   **would at any time in the past five years, whether it**

17   **was as an independent contractor or as an employee.**

18   Q.       And do you have a LinkedIn page?

19   **A.       Yes.**

20   Q.       And the LinkedIn page lists Risk

21   Management?

22   **A.       Yes, oh, yeah.**

23   Q.       Did Risk Management ever have an insurance

24   policy?

25   **A.       No.**

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 145

```
 1   Q.        You are.

 2   A.        Right.

 3   Q.        And I'm making sure that --

 4   A.        Yes.

 5   Q.        -- you actually did that?

 6   A.        It -- does my signature mean what it

 7   implies?

 8   Q.        Yes.

 9   A.        Yes.

10   Q.        Good.   Good.

11             Did you ever apply for New York state

12   unemployment benefits?

13   A.        I spoke with them, but did not.

14             MR. HECKMAN:  All right.  We're at the

15   end of the tape so we'll take a break here.

16             THE VIDEOGRAPHER:  We're at the end of

17   tape number three.  We're now going off the record.

18   The time is 2:20 p.m.

19             (Recess taken.)

20             THE VIDEOGRAPHER:  This is the

21   beginning of tape number four.  We're now back on

22   the record.  The time is 2:32 p.m.

23   Q.        Mr. Sellers, are you claiming retaliation

24   in your lawsuit?

25   A.        Yes.
```

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.              Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers           October 10, 2013

Page 153

```
 1   A.        Yes.

 2   Q.        Right?

 3             Can you tell us what Exhibit 3 is?

 4   A.        Well, Exhibit 3 is a letter from the EEOC

 5   to RBC Capital Markets saying that they view that

 6   letter, kind of repeating what you just said, but

 7   they view that letter as retaliation against the

 8   charging party, which is me personally, and

 9   furthermore, it, as they say here, strongly urges

10   the respondent to withdraw the threat contained in

11   this letter.

12   Q.        Okay.  And have you seen Exhibit 3 before?

13   A.        Yes.

14   Q.        And, in fact, I believe it was part of not

15   the specific copy in front of you because that's

16   Bates stamped with an RBC number at the bottom, but

17   it was part of the materials that you produced --

18   A.        Yes.

19   Q.        -- as the EEOC file?

20   A.        That's correct, that is correct.

21   Q.        And did RBC, in fact, withdraw its threat

22   contained in the February 5th letter which is

23   Exhibit 2?

24   A.        From what I understand from the EEOC file,

25   that a -- I don't know if you're about to hand me
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 154

1    that letter.  I'm going to guess -- I'm going to

2    guess you're going to hand me a letter that says

3    that they have no intention of carrying through on

4    the threat.

5    Q.      Well, are you aware of the existence of

6    such a letter?

7    A.      Yes, it's part of the EEOC file that I gave

8    you guys.

9    Q.      And you've seen that letter before?

10   A.      I have indeed.

11   Q.      All right.  Well, then let's mark that

12   letter.

13           (Exhibit Sellers 4, letter dated

14   June 8, 2011, was marked for identification.)

15           THE WITNESS:  Thank you.

16   Q.      And, Mr. Sellers, you've been handed what

17   has been marked as Exhibit 4?

18   A.      Yes.

19   Q.      Please take your time to review.  And my

20   question to you will be --

21   A.      Yes.

22   Q.      -- is this the letter that we were just

23   referring to?

24   A.      It is indeed.  That's it.

25   Q.      All right.  Has RBC indicated to you any

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers          October 10, 2013

Page 155

1    change in its position referenced or reflected in

2    Exhibit 4?

3    **A.        With respect to this specific threat, no.**

4    Q.        Okay.  Have any, in your opinion, other

5    threats been made since the receipt of Exhibit 4?

6    **A.        What I would say, as I said before, it has**

7    **the same effect on me and feels the same way is the**

8    **threat to seek to recover -- the defendants seeking**

9    **to recover their legal expenses for the litigation**

10   **from me that is from the plaintiff's point of view**

11   **an economic threat that could be as devastating, if**

12   **not more devastating.  So in that sense, they're**

13   **both threats to me.**

14   Q.        Well, since June 28th, 2011, which is the

15   date of the letter in Exhibit 4 --

16   **A.        Yes.**

17   Q.        -- has RBC or anyone on RBC's behalf made a

18   demand or request of you to reimburse RBC for its

19   costs involved in this litigation?

20   **A.        No, not a demand.  You said a demand,**

21   **right?**

22   Q.        A demand or a request.

23   **A.        Yeah.  No, not a request or a demand.**

24   Q.        Why the --

25   **A.        But this is -- neither of these letters are**

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 157

1    Federal Rules of Civil Procedure?

2    **A.       I believe it's the latter.  I'm sure that**

3    **it's not the former and I believe it's the latter.**

4    **Whether it arises out of other things other than the**

5    **Federal Rules of Civil Procedure, I can't tell you.**

6    Q.       All right.  And just so we're clear, I

7    think we're clear, but just so we're clear,

8    since the initiation of this litigation or even

9    June 28th, 2011 --

10   **A.       Yes.**

11   Q.       -- have you personally received or has Risk

12   Management received a specific demand for the

13   reimbursement of its -- of RBC's legal costs or fees

14   in this litigation?

15   **A.       No, no.**

16   Q.       Have you received or has Risk Management

17   received since those time frames any correspondence

18   or threats or communications indicating to you that

19   RBC was reserving its rights under the contract with

20   Risk Management to seek the recovery of costs and

21   fees in this litigation?

22   **A.       No.**

23   Q.       Okay.  Do you confer with anyone to assist

24   you in this litigation?

25   **A.       No.  I wish I could.**

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 166

1   in corporate banking in Toronto, the overall head of

2   group corporate banking.

3   Q.       And who was that?

4   A.       Patti Perras Shugart.

5   Q.       Other than that change, do you have any

6   facts to suggest?

7   A.       Let me think if there were other facts, any

8   changes.

9           I don't recall any other -- any other

10  changes.  That certainly was the -- a key change in

11  the management hierarchy of corporate banking.

12  Q.       Do you think Mr. Shields was evil-minded

13  towards you?

14  A.       Pardon me.

15  Q.       I'll take that probably as no.

16  A.       Could you define evil-minded, please?

17  Q.       No, no, I won't.

18  A.       Could you define evil-minded?

19  Q.       Are you seeking punitive damages in this

20  litigation?

21  A.       Yes.

22  Q.       Okay.  What conduct do you consider gives

23  rise to the punitive damages?

24  A.       You know, I'm sorry, but I don't know that

25  I can answer that.  And I'm going to have to -- I

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers        October 10, 2013

Page 167

```
 1    hate to -- to fall back on this, but I really do

 2    feel as a pro se litigant --

 3    Q.        Right.

 4    A.        -- I couldn't answer that off the top of my

 5    head --

 6    Q.        Let me --

 7    A.        -- without doing some homework.

 8    Q.        Let me stop you there.

 9    A.        I find myself in this position every now

10    and then.

11    Q.        I'm not asking you --

12    A.        Yeah.

13    Q.        -- for a legal conclusion, I'm not asking

14    for your legal argument --

15    A.        Thank you.

16    Q.        -- I'm asking you as a layperson --

17    A.        Yes.

18    Q.        -- because I would ask this question

19    whether you were pro se or not.

20    A.        Yeah.

21    Q.        What happened to you --

22    A.        Yes.

23    Q.        -- that you feel gives rise to punitive

24    damages?  So when you --

25    A.        Okay.  Again, allow me to again to admit
```

Page 168

1  that my use of words is not going to be as precise

2  as counsel's use of words, but I believe looking at

3  all and thinking real hard over a number of years

4  about everything that went on, I believe that the

5  actions of the defendants, and we can -- setting

6  aside who the individuals are -- was willful, okay,

7  was willful and it caused me significant harm.

8          All right.  Now, whether in -- in your

9  terms or in terms that the court will accept or

10  recognize, that is a basis for punitive damages, I

11  don't know the answer to that.  Okay?

12  Q.       Let me ask you this --

13  A.       So I can't -- I can't really -- I can't

14  really answer in any kind of confident way your

15  question.

16  Q.       Are there any factual circumstances or

17  events that happened to you that are either -- that

18  are not described in the Amended Complaint or at

19  some point in your testimony today?

20  A.       I'm sorry.  Say that again.

21  Q.       Umm-hmm.

22  A.       It's an important question.

23  Q.       Are there any factual circumstances that

24  give rise to this lawsuit that you would consider to

25  be facts and circumstances relevant to this -- to

USDC, SD of NY                 Sellers v. Royal Bank of Canada, et al.              Thursday
No. 12-Civ-1577 (KBF) ECF      Videotape Deposition of David Sellers          October 10, 2013

Page 172

```
 1    age?
 2    A.        Well, there's more than the discrimination
 3    claim, right?  There's also the misclassification --
 4    Q.        Yes, I understand.
 5    A.        -- claim, right?  Okay.
 6    Q.        I'm asking based on age.
 7    A.        Yes, I do.
 8    Q.        And other than what we've talked about
 9    today and other than what's in the Amended
10    Complaint, there are no other critical, important
11    contributory facts to that?  That's why I asked
12    that.
13    A.        You will be the first to know if I uncover
14    anything.
15    Q.        Right.  Okay.
16    A.        I believe I'm duty bound to do that.
17              MR. HECKMAN:  Bless you.
18              THE WITNESS:  Bless you.
19    Q.        During your time at corporate banking, did
20    you receive the formal performance reviews like the
21    regularized employees did?
22    A.        No.
23    Q.        Did you receive a paycheck like the
24    regularized employees did?
25    A.        No.
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 173

1   Q.        In fact, you submitted invoices, correct?

2   **A.        Yes.**

3   Q.        Did you receive during that same time

4   period paid vacation days?

5   **A.        No.**

6   Q.        Paid sick days?

7   **A.        No.**

8   Q.        How did you keep track of the hours that

9   you worked each day?

10  **A.        Daily.**

11  Q.        I'm sorry?

12  **A.        Daily.**

13  Q.        But how did you do it?  Did you have a --

14  **A.        I'm trying to think of it.  I maintained**

15  **a -- I'm going to guess I had a legal pad, that's**

16  **what I'm sort of picturing and I wrote down every**

17  **day exactly what my hours were exactly.**

18  Q.        Did you bill in any kind of increment?

19  **A.        In any kind of increment?  I'm sorry.  What**

20  **does that mean?**

21  Q.        Like a quarterly, quarter hour, a tenth of

22  an hour, a half hour?

23  **A.        Let me think about that.  You know,**

24  **probably in a sort of an unself-conscious way, in**

25  **other words, I probably wouldn't charge for 15**

Page 174

1    minutes -- I don't know if I got down to 15 or -- 15

2    minutes or half hour increments in a day.  Do you

3    have --

4    Q.       I believe I've seen invoices with 15

5    minutes.

6    A.       Yeah.  So then it would have been 15

7    minutes and in all likelihood -- I'm a pretty

8    scrupulous person, believe it or not and in all

9    likelihood I would have rounded to the nearest 15

10   minutes, sometimes down, sometimes up, and I'm

11   pretty careful about that kind of thing.

12   Q.       When you were informed that your contract

13   would not be renewed again --

14   A.       Yes.

15   Q.       -- did you look to see if there were any

16   other opportunities at RBC for you?

17   A.       Well, this is going to be like a response I

18   gave before, and that is the municipal finance

19   banking space as it were is fairly small.  I'm not

20   sure how such an opportunity would exist without me

21   being aware of it, number one.

22           Number two, the decision makers, if I could

23   use that phrase, would certainly be aware of any

24   opportunities in the municipal finance space and it

25   would be very odd for Pat Shields to come up to me

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 177

1   these -- if you lived through and accepted these

2   claims, by definition, you have a personal problem

3   with Mr. Shields.

4   Q.      I don't know.  That's why I asked.

5   A.      Well, I mean, I'm just saying.

6   Q.      Some people can separate their professional

7   lives from their personal lives.  I don't know.

8   A.      I can separate my -- that's not your

9   question, can you separate your personal life from

10  your professional life.

11  Q.      No, my question was do you have a personal

12  problem with Mr. Shields?

13  A.      No, I would not say it's a personal

14  problem, no.

15  Q.      That was my question.

16  A.      No, no personal problem.  I don't -- I

17  didn't interact with him at any kind of what I would

18  call personal level, I interacted with him at a

19  professional level.  Now, professionally, you --

20  there are ethics involved with -- with how you

21  interact with people in the workplace.

22  Q.      Did you ever make any kinds of complaints

23  about Mr. Shields to the internal machinations at

24  RBC?

25  A.      No, no.

USDC, SD of NY                Sellers v. Royal Bank of Canada, et al.                Thursday
No. 12-Civ-1577 (KBF) ECF     Videotape Deposition of David Sellers        October 10, 2013

Page 181

1    payment.  As I recall, that's what I understood it

2    to be.

3    Q.        And that's how that issue ended?

4    A.        Yeah, I'm pretty sure that's the way it

5    ended.  Yeah, yeah, I'm pretty sure.  There was a

6    kind of a tail extension, 30-day extension.

7    Q.        On the contract?

8    A.        On the contract as I recall to wrap up

9    things.  Oh, but I don't -- actually, I don't recall

10   if that was in connection with the -- that severance

11   discussion.  I don't think it was.  I think it was

12   because California needed to be resolved and

13   California was -- wasn't resolved until early

14   February.  So -- and at that point, perhaps I should

15   have seen it coming.  But at that point, the

16   extension that I would have expected to be three

17   months was shortened.

18   Q.        To one month?

19   A.        To one month.

20   Q.        And that's when the California resolved

21   itself?

22   A.        In early February, exactly, yes.

23   Q.        All right.  Let's take a break for a couple

24   minutes.

25   A.        Okay.

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 182

1           THE VIDEOGRAPHER:  We are now going

2     off the record.  The time is 3:18 p.m.

3           (Recess taken.)

4           THE VIDEOGRAPHER:  We're now at the

5     end of tape number four.  And we're now going off

6     the record to switch tapes.  The correct time is

7     3:31 p.m.

8           (Exhibit Sellers 5, letter dated

9     February 6, 2009 with agreement attached, was marked

10    for identification.)

11          MR. HEGRE:  Hi.  This is Jon Hegre.  I

12    just want to notify you all that I'm not going to be

13    listening to the remainder of the deposition, so

14    I'll be heading out.  Thank you for your time.

15          MR. HECKMAN:  Thanks, Jon.

16          THE VIDEOGRAPHER:  This is the

17    beginning of tape number five.  We're now back on

18    the record.  The time is 3:35 p.m.

19    BY MR. HECKMAN:

20    Q.      Okay.  Mr. Sellers, you have what's been

21    placed in front of you is marked Exhibit 5.

22    A.      Umm-hmm.

23    Q.      For the record, it's a series of documents

24    entitled Risk Management Consulting Services, LLC.

25    Agreement For Additional Consulting Services.  The

USDC, SD of NY                     Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF          Videotape Deposition of David Sellers           October 10, 2013

Page 183

```
 1    first page is dated February 6th, 2009.  There are a

 2    series of these Additional Consulting Services

 3    Agreements going back to the --

 4    A.        The master agreement?

 5    Q.        Yeah.  If you go backwards to the

 6    August 7th, 2006 Risk Management Consulting

 7    Services, LLC agreement, which begins at Bates stamp

 8    number RBC 014276.  Okay.  This is reverse

 9    chronological order.

10              And what we're going to do is a bit of

11    housekeeping.  I just want to ask you some basic

12    questions.  We'll flip through this exhibit while we

13    do so.  So I ask you to start on that page that

14    begins the August 7th, 2006 document.

15    A.        I have it.

16    Q.        Okay.  And for the record, can you identify

17    this document?

18    A.        Well, that's the master Consulting

19    Agreement.  That's the initial -- I'll call it a

20    master Consulting Agreement.

21    Q.        Okay.  And if you please take some time and

22    look through it and my question to you will be is

23    this a true and accurate copy of the master

24    Consulting Agreement as you referred to it?

25    A.        It appears to be.  Wait, well hold on a
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 188

1    Q.        Well, in fact it's a bold and underlined

2    line.

3    **A.        Well said.**

4    Q.        Cut.

5              Then moving forward in the packet --

6    **A.        Yes.**

7    Q.        All right.  We have -- I come across a

8    December 20, 2006 Risk Management Consulting

9    Services, LLC Agreement For Additional Consulting

10   Services.  It's a two-page document.

11   **A.        Yes, yes.  Okay.  Risk Management**

12   **Consulting Services.**

13   Q.        Okay.  Turning to that second page --

14   **A.        Yes.**

15   Q.        -- under the Risk Management Consulting

16   Services, LLC signature block, is that your

17   signature?

18   **A.        It is.**

19   Q.        Okay.  And is this a true and accurate copy

20   of the December 20, 2006 Additional Consulting

21   Services Agreement?

22   **A.        It certainly appears to be.**

23   Q.        And I'll refer to that as the Additional

24   Consulting Services Agreement, does that make sense

25   to you?

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers                October 10, 2013

Page 189

```
 1    A.        That's fine.

 2    Q.        Okay.  That way we can save the court

 3    reporter from having to type it.

 4    A.        Is that referring just to this one or is

 5    that referring to all the Additional Consulting

 6    Services Agreements?

 7    Q.        Just to this one document.

 8    A.        Okay.

 9    Q.        All right.  We're going to look at each one

10    and ask the exact same questions.

11    A.        Oh, okay.

12    Q.        I just want to make sure we have all the

13    correct copies.

14    A.        Okay.

15    Q.        All right.  But before we do that, let me

16    ask you this, this, and perhaps the others, if it

17    pertains to all of the others, that's fine, just let

18    me know, but this Additional Consulting Services

19    Agreement incorporates the terms of the master

20    agreement?

21    A.        It should.

22    Q.        It should.

23              Is there anything in the December 20, '06

24    Additional Consulting Services Agreement to indicate

25    to you that it does not incorporate the terms of the
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 190

```
1    August 7th, 2006 master agreement?

2    A.        Do you want me to read through this whole

3    thing and --

4    Q.        Well, the reason why I asked --

5    A.        Yes.

6    Q.        -- is because there was a bit of an

7    equivocation in your response --

8    A.        Yes.

9    Q.        -- of it should versus it does, so I want

10   to know if there's some reason for you to suspect

11   that it does not incorporate the master agreement?

12   A.        I have no reason to believe that it does

13   not.  However, to answer your question with complete

14   confidence and authority, I'd have to read it and

15   tell you that.  But I have no reason to believe it

16   does not.

17   Q.        Please take your time.  Read it.

18   A.        Okay.

19   Q.        And then I will take your answer in

20   complete confidence.

21   A.        Okay.

22             Okay.  Now, your question?

23   Q.        My question is does this Additional

24   Consulting Services Agreement incorporate the terms

25   of the master agreement?
```

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 191

1   A.        Yes, I believe it does.

2   Q.        Do all of the subsequent Additional

3   Consulting Services Agreements incorporate the terms

4   of the master agreement?

5   A.        They should.

6   Q.        Do you have any reason to suspect that they

7   do not?

8   A.        I have no reason to suspect they do not.

9   Q.        Then we can circumvent this process.

10  A.        Okay.

11  Q.        Now, flipping forward another two pages --

12  A.        Oh, okay.

13  Q.        -- I see here or you tell me what you see

14  here.  It should say February 1st, 2007.

15  A.        Okay.

16  Q.        Okay.  Am I correct in that this is a

17  February 1st, 2007 Additional Consulting Services

18  Agreement?

19  A.        Indeed.

20  Q.        And turning to the second page, is that

21  your signature under the Risk Management Consulting

22  Services?

23  A.        Yes.

24  Q.        Please take your time and review this

25  document and my question to you is --

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 192

1    A.        Yeah.

2    Q.        -- is this a true and accurate copy of the

3    February 1st, 2007 Additional Consulting Services

4    Agreement?

5    A.        I believe it is.

6    Q.        Please fast forward two pages.  Do you see

7    March 22nd, 2007?

8    A.        Indeed.

9    Q.        Okay.  My question is -- what's my

10   question?  My question is is this the March 22nd,

11   2007 Additional Consulting Services Agreement?

12   A.        Sure looks it.

13   Q.        Okay.  Turning to the second page, is that

14   your signature?

15   A.        It is.

16   Q.        Is this a true and accurate copy of the

17   March 22nd, 2007 Additional Consulting Services

18   Agreement?

19   A.        Appears to be.

20   Q.        This is fun and exciting.

21             Please fast forward two pages.

22   A.        Yes, yes.

23   Q.        Is that your -- is this a true and accurate

24   copy of the June 29th, 2007 Additional Consulting

25   Services Agreement?

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 193

1    A.        I believe so.

2    Q.        Is that your signature on the second page?

3    A.        Indeed.

4    Q.        Please fast forward two more pages.

5    A.        Yep.

6    Q.        Is this a true and accurate copy of the

7    September 20, 2007 Additional Consulting Services

8    Agreement?

9    A.        As true as the previous ones.

10   Q.        And is that your signature on the second

11   page?

12   A.        Yes.

13   Q.        Then we get to December 28th, 2007.

14   A.        Yes.

15   Q.        Is this an -- and we're looking at the two

16   pages here?

17   A.        Umm-hmm.

18   Q.        Is this a true and accurate copy of the

19   December 28th, 2007 Additional Consulting Services

20   Agreement?

21   A.        I can't say for sure on this one.

22   Q.        Okay.  And why not?

23   A.        Because it's not signed by me.

24   Q.        Is there a signed version of the

25   December 28, 2007 agreement?

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 194

1    A.        There certainly is.  There should be.

2    Q.        Okay.

3    A.        But I don't see the signature on this.  It

4    is signed by Argyle Burke.  I'm going to guess that

5    this signature page that I sent back was just

6    attached to this, but it's not here, so is this --

7    is this possibly a draft?  I wouldn't think so

8    because I don't believe these things were changing

9    in midstream, so it has every appearance of being

10   correct.

11   Q.        Well, would -- in your experience in

12   negotiating these contracts with RBC, would Argyle

13   Burke sign draft agreements?

14   A.        He could certainly signed an agreement and

15   miss something that I then bring to the attention of

16   the bank, which causes it to be amended.  This is

17   not signed by Argyle Burke, this is signed for

18   Argyle Burke, so we can't know that Argyle Burke

19   actually looked at this document at all.

20   Q.        You can't know that he didn't?

21   A.        Pardon me?

22   Q.        You can't know that he did not either?

23   A.        That's the other side of the coin.

24   Q.        My question though was --

25   A.        Yeah.

Page 195

1   Q.        -- in your experience in negotiating these

2   contracts --

3   A.        Yes.

4   Q.        -- did you ever receive one signed by

5   anyone on behalf of RBC that was then subsequently

6   amended because it was a draft?

7   A.        I don't recall.  I don't recall having to

8   do that and I think it's somewhat unlikely because

9   these -- these agreements continued through time.

10  However, let me just say that, okay, this is

11  December 28, 2007, this is still within group risk

12  management.

13  Q.        Correct.

14  A.        I don't recall a change in the assignment.

15  However, I would note something else too.  There is

16  no Appendix A to this, so there's another thing

17  that's missing.  Is it possible that the term's

18  somehow in there?  I don't know.  You're looking for

19  a definitive answer and I'm saying it's not signed.

20  I don't see an Appendix A, ergo, I'm not going to

21  give you a definitive answer.

22  Q.        That wasn't my question.

23  A.        Oh.

24  Q.        My question was in your experience in

25  negotiating these contracts with the bank, have you

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 196

1   ever received one signed by the bank that was only a

2   draft?

3   **A.        That could be.  I don't know the answer to**

4   **that.  It could be.  They're all a draft until I**

5   **sign them.  If there was a change, as I said, if**

6   **there was a change in the Appendix --**

7   Q.        Right.

8   **A.        -- it would be submitted to me as a**

9   **draft --**

10  Q.        Right.

11  **A.        -- right, until I've had a chance to look**

12  **at it.  Now, the bank may have --**

13  Q.        Very simple question, very simple question.

14  Can you recall ever receiving a contract signed by

15  the bank that was only a draft, signed fully

16  executed by the bank, whoever signed it?

17  **A.        I don't recall that.**

18  Q.        Okay.  That's the question.

19  **A.        Yeah.**

20  Q.        All right.

21  **A.        I don't recall that.  It doesn't mean it**

22  **didn't happen, but I don't recall.**

23  Q.        Right.  It doesn't mean it happened or it

24  didn't happen, you just can't tell me definitively

25  with a recollection of it specifically occurring?

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers                October 10, 2013

Page 197

```
 1    A.         Yes.

 2    Q.         Okay.

 3    A.         I'll have to agree with that.

 4    Q.         There we go.  We're getting somewhere.

 5    A.         We are slowly but surely.

 6    Q.         Slowly but surely.

 7               Now, fast forwarding again, you come to the

 8    February 1st, 2008 --

 9    A.         Yes.

10    Q.         Okay.  You have three pages --

11    A.         Indeed.

12    Q.         -- correct?

13    A.         Yes.

14    Q.         Okay.  And do we have here a true and

15    accurate copy of the February 1st, 2008 Additional

16    Consulting Services Agreement?

17    A.         It appears to be the case.

18    Q.         Okay.  Is it your -- and --

19    A.         That's my signature.  Yes, that's my

20    signature.

21    Q.         Okay.  Yes, it's your signature?

22    A.         Yes.

23    Q.         Okay.  All right.  And to your

24    recollection, is this the first time that you

25    entered into an Additional Consulting Services
```

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.          Thursday
No. 12-Civ-1577 (KBF) ECF      Videotape Deposition of David Sellers        October 10, 2013

Page 198

```
 1   Agreement that was no longer in Risk Management but

 2   was with corporate banking?

 3   A.       Group risk versus corporate banking.

 4   Q.       Group risk?

 5   A.       Yes, that's right.

 6   Q.       I apologize.

 7   A.       I'm Risk Management.

 8   Q.       Are there material differences in the terms

 9   of this Additional Consulting Services Agreement

10   versus the ones that we have seen for group risk?

11   A.       Absolutely.

12   Q.       Okay.  And you negotiated those changes in

13   the terms?

14   A.       I negotiated them in effect.  I mean --

15   Q.       What do you mean?

16   A.       Well, I'm trying to remember if there was

17   any real give and take or these terms were sort of

18   the terms that were given to me and said this is the

19   way it's got to work.

20   Q.       Okay.

21   A.       So I mean, negotiations involves a little

22   bit of a back and forth shall we say.  And so I

23   mean --

24   Q.       Do you?

25   A.       -- these are the terms that we went forward
```

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF         Videotape Deposition of David Sellers                 October 10, 2013

Page 201

1    because we at that point both want to do that.

2    So....

3    Q.        Okay.  And does the February 1, 2008

4    agreement incorporate the terms of the August 7,

5    2006 master agreement?

6    A.        It should, it should.  It ultimately has to

7    go back to the master agreement.  It should --

8    Q.        Okay.

9    A.        -- if it works the way it's supposed to.

10   Q.        Signature.

11             I want to look now at the Appendix A for a

12   second, so the third page of that, the description

13   of the role section.  Do you see that?

14   A.        Just a second.

15             Yep.

16   Q.        At the time, did that accurately reflect

17   the description of the role?

18   A.        All those things were part of what I did,

19   yes.

20   Q.        Okay.

21   A.        All those things were part of what I did.

22   Q.        All right.  Then if we fast forward I think

23   three pages --

24   A.        Yep.

25   Q.        -- we have an April 16, 2008 --

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 202

```
 1    A.        Yep.

 2    Q.        -- extension, Additional Consulting

 3    Services.

 4    A.        Yep.

 5    Q.        Is this a true and accurate copy of the --

 6    A.        Appears to be, appears to be.

 7    Q.        And is that your signature on the second

 8    page?

 9    A.        Indeed.

10    Q.        And does the Appendix again reflect what

11    you were doing at the time under the Description of

12    Role?

13    A.        Yes, appears to be the exact same

14    description, yes.

15              THE WITNESS:  Bless you.

16              MR. HECKMAN:  Bless you.

17    Q.        Yes.  I understand it appears to be the

18    exact same description, but is it still reflecting

19    what it was that you were doing at the time?

20    A.        In a Cliff Notes version of course.

21    Q.        Yeah, right.

22    A.        In a very superficial version, yeah, I did

23    all those things and then some.

24    Q.        Right.

25    A.        Yeah.
```

Page 203

 1   Q.        If we can fast forward three pages, is this

 2   a --

 3   **A.        We're looking at July 7th?  Yeah.**

 4   Q.        -- true and accurate July 7th, 2008

 5   Additional Consulting Services Agreement?

 6   **A.        Yes.**

 7   Q.        And is that your signature on the second

 8   page?

 9   **A.        Yep.**

10   Q.        And, again, we have the same description of

11   the role, the same --

12   **A.        Yeah.**

13   Q.        -- the reflection of what it was?

14   **A.        In a very cursory sort of superficial way,**

15   **yeah.**

16   Q.        I understand.

17             And if we go forward three pages --

18   **A.        Yep.**

19   Q.        -- is this a true and accurate copy of the

20   September 30, 2008 Additional Consulting Services

21   Agreement?

22   **A.        Sure looks that way.**

23   Q.        All right.  Is that your signature on the

24   second page?

25   **A.        Yes.**

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers              October 10, 2013

Page 204

```
 1    Q.        If you look at the Description of Role in
 2    the Appendix on this one?
 3    A.        I see it.
 4    Q.        All right.  Is that your handwriting there?
 5    A.        It is.
 6    Q.        Okay.
 7    A.        Yeah.
 8    Q.        And does that read, "Note, colon, no longer
 9    with the bank," and I believe it's referring to Alex
10    Birr?
11    A.        As Alex Birr is circled, yes.
12    Q.        Okay.
13    A.        In fact, it doesn't show there, but there's
14    a line from that little circle there going down to
15    that note.
16    Q.        Okay.  And but for the -- if we were to put
17    Mr. Sigmund's name where it says, "Assist Alex
18    Birr," if we were to put Mr. Sigmund's name there,
19    would this then again be a description at a high
20    level of the role that you were performing, the
21    assignments that you were performing?
22    A.        Yeah, that's the same language, yeah.
23    Q.        Again, going forward three pages, is this a
24    true and accurate copy of the January 2nd, 2009
25    Additional Consulting Services Agreement?
```

Page 205

1    A.        It is, yes.

2    Q.        And is that your signature on the second

3    page?

4    A.        It is, yep, yep, yep.

5    Q.        And the same question about the description

6    of the role at a high level, is that an accurate --

7    A.        It hasn't changed, it hasn't changed, yep.

8    Q.        Okay.  Although I see here it's been

9    crossed out, Alex Birr has been crossed out --

10   A.        Yes, it has and I've initialed that change.

11   Q.        That's your initials.

12             Okay.

13   A.        Yeah.

14   Q.        And in place of Mr. Birr, you've put Pat

15   Shields, correct?  Is that what that says?

16   A.        I don't believe that's my handwriting.

17   Q.        No?

18   A.        In that case, no.  That is not my -- I

19   don't think so.  I could be wrong.

20   Q.        But if it's somebody else's handwriting,

21   you're initialling that it's okay --

22   A.        Absolutely.

23   Q.        -- to the right?

24   A.        Absolutely.

25   Q.        That's a DJS?

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers           October 10, 2013

Page 206

```
 1   A.        DJS, yes.

 2   Q.        DJS.

 3             If we go forward three pages, we come to a

 4   February 6th, 2009?

 5   A.        Yeah.

 6   Q.        Is this an accurate copy of the

 7   February 6th, 2009 Additional Consulting Services

 8   Agreement?

 9   A.        It does appear to be the case, yes.

10   Q.        And is that your signature on the second

11   page?

12   A.        It is, it is.

13   Q.        And here we have in the Appendix a

14   description of the role that now has the name

15   actually typed in Patrick Shields.  Is again at a

16   high level this the applicable description of your

17   role?

18   A.        Right.

19   Q.        Okay.  Am I missing any to your

20   recollection going forward from -- were there any

21   after February 6th, 2009?

22   A.        No, that's the last one because it --

23   Q.        Okay.

24   A.        -- it has an expiration date of

25   February 27th, 2009.
```

USDC, SD of NY                    Sellers v. Royal Bank of Canada, et al.                    Thursday
No. 12-Civ-1577 (KBF) ECF        Videotape Deposition of David Sellers               October 10, 2013

Page 207

1    Q.        Right.  And that was it?

2    **A.        Umm-hmm.**

3    Q.        Were you aware at the time that you signed

4    this agreement, which is February 9, 2009, that it

5    would not be renewed again?

6    **A.        That's a very date specific thing.  I**

7    **would -- hmm.  Was I aware at that date?**

8    Q.        Yeah, when you signed it.

9    **A.        Okay.  Here's -- here's the sequence of**

10   **events and we'd have to look at a calendar.  The**

11   **crucial closing of the state of California occurred**

12   **on a Friday.  And you have to bear with me on this**

13   **because I'm doing this from recollection.  Okay?**

14   Q.        Umm-hmm.

15   **A.        And I was told by Pat Shields over the**

16   **phone on either Monday or Tuesday as I recall and I**

17   **think this is in the -- I know it's in the Amended**

18   **Complaint.  Just give -- bear with me one second.**

19   **See if I can lay my hands right on it.**

20   Q.        You know what, while you're doing that --

21   **A.        Yeah.**

22   Q.        -- while you're doing that --

23   **A.        Yeah.**

24   Q.        -- let's mark the Amended Complaint as an

25   exhibit.  I have it, so you can put that to the

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 213

1    Sunday night, I signed it if it was given in

2    advance, but dated it for the -- for Monday because

3    that was the business day that I was going to be

4    delivering it, allowing that possibility.  So I

5    can't say.

6    Q.       Can you recall right now --

7    A.       Yes.

8    Q.       -- an actual occurrence of you signing one

9    of these contract extensions on a Sunday and dating

10   it for a Monday?

11   A.       No.  It doesn't mean it didn't happen.

12   Q.       I didn't say that.  Can you tell me

13   though --

14   A.       No.

15   Q.       -- a specific time of doing that?  That's

16   all I'm asking.

17   A.       And my answer's the same.

18   Q.       It's no, right?

19   A.       No, I can't recall that.

20   Q.       Okay.  Not to beat the bush --

21   A.       I think it's the dead horse.

22   Q.       Well, we'll keep our PETA friends happy.

23   A.       Okay.

24   Q.       Certainly no later than February 9th or

25   February 10th, 2009, you were aware that the

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 214

1    contract was not going to be extended again?

2    A.      Yeah.  And I think it was the 10th is when

3    I was informed, at some point on the 10th.

4    Q.      Do you have an ERISA claim in this lawsuit?

5    A.      Yes.

6    Q.      Okay.  The ERISA claim, if I understand it,

7    is a claim for certain benefits governed by the

8    RBC's ERISA benefit plans; is that correct?

9    A.      Correct, correct.

10   Q.      Have you ever filed any type of claim with

11   the benefit plan administrators for those benefits

12   for which you are seeking?

13   A.      No.

14   Q.      Okay.  Five minutes, I think we're done,

15   but I need five minutes or so to --

16   A.      Cool.

17   Q.      -- check stuff out.  All right?

18           THE VIDEOGRAPHER:  We're now going off

19   the record.  The time is 4:17 p.m.

20           (Recess taken.)

21           THE VIDEOGRAPHER:  We're now back on

22   the record.  The time is 4:30 p.m.

23           MR. HECKMAN:  All right.  Mr. Sellers,

24   I have no further questions today.

25           I do just want to put on to the record that

USDC, SD of NY
No. 12-Civ-1577 (KBF) ECF

Sellers v. Royal Bank of Canada, et al.
Videotape Deposition of David Sellers

Thursday
October 10, 2013

Page 218

```
 1              C E R T I F I C A T E
 2         I, ELLEN V. LETCHFORD, a Certified Court
 3    Reporter and Notary Public, do hereby certify that
 4    prior to the commencement of the examination,
 5              DAVID SELLERS
 6    was duly sworn by me to testify to the truth,
 7    the whole truth and nothing but the truth.
 8         I do further certify that the foregoing is
 9    a true and accurate transcript of the stenographic
10    notes of testimony taken by me at the time, place
11    and on the date hereinbefore set forth.
12         I do further certify that I am neither a
13    relative nor employee nor attorney nor counsel of
14    any of the parties to this action, and that I am
15    neither a relative nor employee of such attorney or
16    counsel and that I am not financially interested in
17    this action.
18
19    _____
20    ELLEN V. LETCHFORD, CCR, RPR, RMR, CRR
21    Certificate No. 30XI00081100
22    Date:  October 13, 2013
23
24
25
```

# EXHIBIT B



Search for people, jobs, companies, and more...    Advanced

Home    Profile    Network    Jobs    Interests                    Business Services    Upgrade

**Attn: Attorneys & Lawyers - Our Customers Need You! Get 10 Free Leads for New Clients Today!**

# David Sellers
**Sole Proprietor at Risk Management Consulting Services LLC**

Greater New York City Area    Banking

| | |
|---|---|
| Previous | WestLB AG (formerly Westdeutsche Landesbank), The Sanwa Bank Limited, Chemical Securities, Inc./ Chemical Bank |
| Education | Syracuse University - Maxwell School of Citizenship and Public Affairs |



**59**
connections

www.linkedin.com/pub/david-sellers/3b/723/695/

Background

## Summary

Senior level financial professional with over 25 years progressive experience and responsibility at major U. S. and overseas based financial institutions, more recently operating independently as a consultant with contracts with large global banks. Currently available for regular employment or consulting assignments in public finance banking, capital markets, risk management and/ or non-bank financial institution counterparty risk management, or other work that will build upon as it challenges career path expertise, including:
-Managing risks of large diversified portfolios of credit and market limits/ exposures.
-Managing banking client relationships.
-Negotiating financial documentation.
-Structuring credit and liquidity enhancement facilities.
-Establishing credit policies and procedures and ensuring compliance with regulatory regimes and internal and external bank auditors.
-Designing, testing and implementing internal risk based models (i.e., Basel II) for large public finance portfolios.
-Hiring, training, mentoring and managing analysts and banking associates.
-Making presentations to senior management and other internal and external bank constituencies related to new product development and portfolio management.

Specialties:In addition to above:
-Traditional and structured public finance credit and market products, involving most types of tax-backed and revenue credits.
-Counterparty credit and market risk management of large portfolios involving non-bank financial institutions, including institutional funds, investment advisors, regulated and non-regulated/ hedge funds, etc., and products, such as repo/ reverse repo, securities lending, foreign exchange, redemption and subscription commitment facilities, etc.

## Experience

### Sole Proprietor
Risk Management Consulting Services LLC
July 2006 – Present (7 years 4 months)

Multiple seamless contracts within corporate banking, capital markets and risk management departments of a leading Canadian Bank, structuring and negotiating letters of credit and liquidity facilities and evaluating risk exposures, re-structuring a large syndicated facility for state commercial paper program; designed, tested and implemented Basel II compliant Internal Risk Based models for Public Sector Entities (2006-2009). Additional contract with NY branch of leading Swiss investment bank to evaluate the credit and market risks underlying values of large diversified portfolios of municipal bonds (2008). Note: Most recent institutional affiliation is outside of career path, as a Visiting Artist in the Visual Arts Program, Lewis Center for the Arts, Princeton University (fall semester 2010 – present).

### Executive Director/ Team Head
WestLB AG (formerly Westdeutsche Landesbank)

**People Similar to David**



**Constantine Boyadjiev** 3rd
Founder & President at Calibra Consulting L...
Connect



**People Also Viewed**


**Pete Papageorgakis, CFA**
Head of Product Development & Management


**Glen Casey**
Managing Director, Goldman Sachs Asset Management

**George Hammond**
Attorney, Author and Lecturer

**Eileen North**
Director at Portigon AG

**Gary Perusse**
Senior VP, Risk Management at Covanta Energy

**Duncan Robertson**
Executive Director at WestLB

**James Winikor**
Distressed Commercial Real Estate and Portfolio Management

**Safiyah Spann-Brisbane**
Vice President, Real Estate Legal

**Eric Seward**
Partner at Church Tavern Advisors, LLC

**Edward Farrell**
Executive Director at Morgan Stanley

1993 – 2006 (13 years)

Search for people, jobs, companies, and more...        Advanced

Home   Profile   Network   Jobs   Interests

Risk Manager and Team Head for large, diversified portfolios, including U. S. and Canadian Public Finance ($12 B commitments), Insurance, including financial guarantors ($15 B), Institutional Funds/ Investment Advisors/ regulated and non-regulated (hedge) funds (trading and credit limits for 3,000+ counterparties), U. S. Government Supported Enterprises ($5 B investment and trading book positions). Wrote credit policies and risk management procedures for same. Hired, trained and managed analysts. Member of global committees to establish Basel II compliant internal rating models. Member of NY Branch Credit Committee.

In Common with David



You        Business Services        Upgrade
           David

        1

     Location

### Vice President/ Sr. Public Finance Officer
The Sanwa Bank Limited
1989 – 1992 (3 years)

Originated and negotiated letters of credit and liquidity facilities for public finance clients, analyzed financing structures, documentation and creditworthiness and coordinated inter-bank relationships for syndications and participations. Panelist at industry conferences.

### Vice President and Team Manager
Chemical Securities, Inc./ Chemical Bank
1985 – 1988 (3 years) | New York City

Managed a team responsible for originating and structuring bond issues and private placements in mid-Atlantic states. Head of Public Finance Technical Group, managing a team responsible for product development, documentation and structuring negotiated bond issues, and credit and quantitative support for the Bank's underwriting and financial advisory clients. Designed and managed Louis Harris survey of financial advisory market. Represented Bank at industry related conferences. Completed PSA Public Finance Institute's Manager's Program, University of Michigan School of Business Administration.

### Director of Tax-Backed Group/ Assistant Vice President
Financial Guaranty Insurance Company ("FGIC")
1984 – 1986 (2 years) | Greater New York City Area

Evaluated risks and hired and managed analysts in bond insurance underwriting of tax-backed financings in the primary and secondary markets. Established and implemented underwriting criteria and risk management policies for the then new company. Developed products and participated in regional new business initiatives.

### Associate Investment Banker
Morgan Guaranty Trust Company of New York
1982 – 1984 (2 years) | Greater New York City Area

Financial advisor and investment banker for public authorities and other revenue bond issuers, coordinating bond and note financings, analyzing alternative financing structures, preparing and presenting new business proposals, determining eligibility for Bank underwriting, represented Bank and clients at public hearings.

### Skills & Expertise

4   Capital Markets

3   Portfolio Management

2   Credit Risk

### Education

### Syracuse University - Maxwell School of Citizenship and Public Affairs
Master of Public Administration, Public Financial Management and Budgeting
1981 – 1982

### Princeton University - Woodrow Wilson School for Public and International Affairs
Non-degree coursework completed in Urban Affairs and Domestic Policies

1978 – 1980

Graduate level courses (21 hours credited) completed in the University's Program in Continuing Studies.

Search for people, jobs, companies, and more...   ▾   Advanced 

Home    Profile    Network    Jobs    Interests    Business Services    Upgrade

**Rider University**
Bachelor of Arts, Political Science
1970 – 1974

Help Center   About   Press   Blog   Careers   Advertising   Talent Solutions   Tools   Mobile   Developers   Publishers   Language   Upgrade Your Account

LinkedIn Corporation © 2013   User Agreement   Privacy Policy   Community Guidelines   Cookie Policy   Copyright Policy   Send Feedback

# EXHIBIT C



**ROYAL BANK OF CANADA**

One Liberty Plaza
165 Broadway
New York, NY 10006-1404
Telephone (212) 428-6200

August 7, 2006

Mr. David Sellers
Risk Management Consulting Services, LLC
24 East Prospect Street
Hopewell, NJ 08525
Tax Identification Number:  20-5184850

<u>**Risk Management Consulting Services, LLC**</u>
<u>Consulting Agreement</u>

Dear Mr. Sellers:

This letter ("Letter Agreement" or "Agreement") sets forth the terms under which <u>**Risk Management Consulting Services, LLC**</u> (the "Consultant") will act as a consultant to Royal Bank of Canada ("RBC" or the "Firm") and other members of the RBC Financial Group.[1]  It is agreed as follows:

         1.      **Consulting Services**.  During the period beginning **August 7, 2006 through November 7, 2006** (the "Term") or until one of the parties exercises its right to terminate the Agreement pursuant to Section 3 below.  The Consultant agrees to provide to RBC and other members of the RBC Financial Group consulting and related services as defined in **Appendix A -** (the "Consulting Services").  During the Term, specific assignments related to Consulting Services shall be determined by and communicated to the Consultant by **Andrew D. Brown** or such other person as may be designated by the Chief Operating Officer of RBC.  The Term can be extended by mutual agreement of the parties in writing.

        It is understood and agreed that the Consulting Services will be performed by **David J. Sellers** who will perform the Consulting Services in a professional manner conforming to generally accepted industry standards and practice and any other standards that may be agreed to in writing by the Firm and the Consultant.

        The Consultant agrees that its employees will utilize the Firm's Project Tracking System (PTS) (if applicable) weekly in order to monitor assignments and allocate costs to business groups.

---

[1]    For purposes of this Letter Agreement, the term "RBC Financial Group" includes the Firm, Royal Bank of Canada, RBC Dominion Securities, Inc., RBC Dominion Securities Limited, RBC Dain Rauscher Inc., RBC Dain Rauscher Wessels, RBC Dain Rauscher Corporation, RBC Capital Markets, RBC Capital Markets Corporation and each and all of their subsidiaries, affiliates, business units, agencies, groups, branches, associated companies, successors and assigns.

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 2 of 8

The Consultant agrees to provide the Firm with appropriate work authorizations for its employees or independent contractors assigned to the Firm in compliance with the US Immigration and Reform Act.

It is expected that the Consulting Services will generally require the physical presence of the Consultant's employees or independent contractors at the Firm's offices in New York, NY or elsewhere in the United States and Canada, but may also include telephone conversations and other communications with Firm employees, consultants or vendors.   RBC agrees to reimburse Consultant for legitimate business expenses associated with business travel. All expenses should be pre-approved prior to the expense being incurred.

2.    **Consulting Fee**.  In consideration for the Consulting Services, RBC shall pay the Consultant a fee of US$150 per hour for each hour in which Consulting Services are rendered (the "Consulting Fee").    The Consultant agrees that its employees or consultants will not be paid for absences (vacation, holiday, illness etc.) and the invoice will be reduced accordingly to reflect such absences.  It is also agreed that the Consultant will invoice the Firm for the Consulting Fee, based on actual days worked on a monthly basis, in arrears, and that it will submit with the invoices the Consulting Services performed during the billing period.  The invoices shall be payable by the Firm within thirty (30) days from the date they are submitted.

3.    **Termination Rights**.  This Letter Agreement may be terminated by either party on fourteen (14) days written notice for any reason.  In such event, unless otherwise agreed in writing, the Consultant shall render Consulting Services, and the Firm shall pay the Consulting Fee, through the effective date of termination and, except as expressly set forth herein, neither party shall have any further obligation under this Letter Agreement.

4.    **Additional Consulting Services**.  In addition to the Consulting Services, the Consultant may, from time to time, provide additional consulting and related services to the Firm and other members of the RBC Financial Group (the "Additional Consulting Services").  The nature of the Additional Consulting Services, the qualified individuals performing the Additional Consulting Services and the amount of the fee in consideration for the Additional Consulting Services (the "Additional Consulting Fee") shall be agreed to in writing by the parties.

Unless otherwise agreed to in writing by the parties, any Additional Consulting Services may be terminated by RBC or the Consultant on written notice for any reason, such termination to be effective on the date notice is given (or such other date as may be stated in the notice or agreed to in writing by the parties) with no further obligation on behalf of RBC or the Consultant except for any amount of accrued and unpaid Additional Consulting Fee.  Except as expressly set forth in this paragraph or agreed to in writing by the parties, the Additional Consulting Services and any such person, consultant, contractor or subcontractor performing such shall be subject to the terms of this Letter Agreement.

RBC_014277

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 3 of 8

5.      <u>Nature of Relationship</u>.  During the Term, the Consultant will act as an independent contractor.  No employment relationship is intended or will exist between the Consultant (or its employees or independent contractors) and RBC or any other member of the RBC Financial Group by virtue of this Letter Agreement or the Consulting Services or Additional Consulting Services, nor will this Letter Agreement or the Consulting Services or Additional Consulting Services be construed to establish a relationship between them as partners or joint venturers.  Except as expressly authorized in writing, the Consultant may not assume any obligations or enter into any contracts on behalf of the Firm.

The Consultant understands that the Firm will not take any deductions of any kind from the Consulting Fee or Additional Consulting Fee and the Consultant acknowledges and agrees that it is solely responsible for any and all tax liabilities and withholdings with respect to its employees or independent contractors assigned to the Firm, including, without limitation, federal, state, local, social security and Medicare withholding taxes and unemployment and workers' compensation insurance.  In addition, the Consultant is solely responsible for any and all employee benefits provided to its employees or independent contractors assigned to the Firm, and has informed such personnel that, as employees or independent contractors of the Consultant, they are not entitled to receive benefits of any kind from the Firm, and as a condition of accepting such assignment such personnel agree to execute now or in the future any and all forms confirming the waiver of such benefits as may be required under the various Firm benefit plans.  The Consultant agrees to indemnify and hold the Firm harmless from any tax liabilities or employment benefit obligations arising from the payments made under this Letter Agreement.  Should any such liabilities or obligations be assessed against the Firm, the Firm shall have the non-exclusive right to deduct any such assessment from any future Consulting Fee or Additional Consulting Fee due to the Consultant.

6.      <u>Insurance</u>.   The Consultant agrees to obtain and maintain insurance coverage throughout the Term in respect of the Consulting Services or Additional Consulting Services as deemed reasonable and appropriate by the Firm, and to provide satisfactory evidence of such insurance upon the request of the Firm.  This insurance may include, without limitation, Worker's Compensation Insurance, Employer's Liability Insurance, Comprehensive General Liability Insurance and Fidelity Bond Insurance.

7.      <u>Confidential Information</u>.  During the Term, the Consultant will have access to information that is confidential and proprietary to RBC and other members of the RBC Financial Group ("Confidential Information").    Confidential Information means, without limitation, all business information or customer information disclosed by the Firm to the Consultant (and its employees or independent contractors) in connection with this Letter Agreement or otherwise, including without limitation, any transaction data, internal reports, studies, memoranda, correspondence, manuals, records, plans, organizational charts or other written, printed or otherwise recorded material produced by or for or belonging to RBC or any other member of the RBC Financial Group which relates to the Firm or other members of the RBC Financial Group or their respective clients, customers, directors, officers, agents or

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 4 of 8

employees or which relates in any manner to their present or future business.   Confidential
Information shall also include the terms of this Letter Agreement.

Confidential Information shall not include any information which (a) at the date
of its disclosure by the Firm is in the public domain or which subsequently enters the public
domain other than through unauthorized disclosure by the Consultant (or its employees or
independent contractors); or (b) was in the rightful possession of the Consultant (or its
employees or independent contractors) prior to the time of its disclosure by the Firm to the
Consultant.

Except as required in the performance of the Consulting Services or Additional
Consulting Services, the Consultant agrees that all Confidential Information shall be held in strict
confidence and that it shall take all steps reasonably necessary to preserve the confidentiality
thereof.  The Consultant shall limit the use of and access to the Confidential Information to only
those of its employees or independent contractors whose responsibilities require such use or
access, and shall advise all such persons, before they receive access to or possession of any of
the Confidential Information, of the confidential nature of the Confidential Information and
require them to abide by the terms of this Letter Agreement.  The Consultant shall disclose the
terms of this Letter Agreement only to those RBC employees who, for purposes of carrying out
the terms of this Agreement, need to know such information.  The Consultant shall be liable for
any breach of this Letter Agreement by any of its employees or independent contractors who
obtain access to or possession of any of the Confidential Information from or through the
Consultant.  Except as provided for herein, the Consultant agrees that it will not, during or after
the Term, disclose Confidential Information to any person (other than in the performance of the
Consulting Services or Additional Consulting Services) or use it for its benefit or that of any
third party.   Nothing herein shall prohibit the Consultant from disclosing Confidential
Information in its possession in response to a lawful subpoena or compulsion of law, provided,
however, that the Consultant shall promptly notify the Firm in writing of such subpoena or
request as soon as possible and before disclosing any information and cooperate through all
reasonable and legal means, at the Firm's expense, in any attempts by the Firm to prevent or
otherwise restrict the disclosure of such information.

8.   **Intellectual Property**.  The Consultant covenants and agrees that the Firm
(or its affiliates or nominees) is the sole and exclusive owner of all discoveries, developments,
designs, improvements, inventions, innovations, processes, techniques, technologies, programs,
know-how, works of authorship and data (whether or not registrable under copyright, trademark
or patent statutes), patents, trade secrets, trademarks or proprietary information which the
Consultant or its employees or independent contractors may make, conceive, develop, produce,
learn, process or acquire, either individually or jointly with others, while providing the
Consulting Services or Additional Consulting Services (collectively, "Inventions and
Discoveries").

The Consultant hereby irrevocably assigns and agrees to assign to the Firm (or its
affiliates or nominees) its entire right, title and interest in such Inventions and Discoveries.

CONFIDENTIAL                                                                                    RBC_014279

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 5 of 8

The Consultant agrees to take all reasonable actions and cooperate as necessary to protect and preserve the intellectual and proprietary rights in Inventions and Discoveries and further agrees to execute and deliver, and cause its employees and independent contractors to execute and deliver, any specific assignments or other papers and lawful documents that might be necessary to perfect the sole right, title and interest in the Firm (or its affiliates or nominees) in the Inventions and Discoveries, and execute and deliver, and cause its employees and independent contractors to execute and deliver, any and all papers and lawful documents required or necessary to obtain and maintain effective patent, copyright or other protection in the United States, Canada and any other country in the Inventions and Discoveries by the Firm (or its affiliates or nominees) during and after the Term of this Agreement and any subsequent agreements.

The Consultant agrees that no electronic files, backups, duplicates etc. or other property shall be kept off premises unless written permission is first received.

The Consultant represents and warrants that it has entered into such agreements with its employees or independent contractors as are necessary for it to be able to give effect to the covenants set forth in this Section.

**9.      Firm Policies**.  The Consultant agrees that it and each of its employees or independent contractors shall abide by all terms and conditions concerning all Firm policies as set forth in the Firm Me & RBC Web Site, Compliance Manual, Anti-Money Laundering Procedures and Code of Conduct, as if they were employees unless the Firm excludes the Consultant. Consultant acknowledges that the Firm, at its sole discretion, may at any time during the Term of this Agreement require the Consultant or any of the Consultant's employees to disclose certain personal information regarding such persons' interests in, and participation in transactions involving the purchasing and selling of, securities and financial instruments, including brokerage statements, and may monitor and restrict such activities after providing the Consultant with written notice of its intent to do so.

**10.      Firm Property**.  The Consultant agrees to deliver at the end of the Term, or at any other time on request by RBC, all property and equipment of RBC or any other member of the RBC Financial Group of any kind it may have.

**11.      Governing Law; Dispute Resolution**.  This Letter Agreement and any claims arising hereunder shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.  If any dispute should arise relating to this Letter Agreement, the interpretation of its terms or otherwise related to the Consulting Services or Additional Consulting Services, the parties agree and hereby acknowledge this as evidence of their intent to submit their dispute to arbitration before a panel of three (3) arbitrators at the American Arbitration Association in New York City as the exclusive forum.  The parties hereby waive any rights to bring any actions for such disputes in any judicial or administrative tribunal and acknowledge such waiver as grounds for removal from any such tribunals.  Notwithstanding the foregoing, for injunctive relief, it is agreed that

RBC_014280

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 6 of 8

any court of competent jurisdiction may also entertain an application by either party.  The parties further agree that no demand for punitive or consequential damages shall be made in any such arbitration proceeding and that the arbitrators shall not have the power to award such damages in any proceeding.  Any award of the arbitrators shall be final and binding, subject only to any right of appeal that may lie as a matter of law.  Each party hereby waives its right in any event to a trial by jury.

          **12.**    <u>Waiver</u>.  No failure by any party hereto at any time to give notice of any breach by the other party, or to require compliance with, any condition or provision of this Letter Agreement shall be deemed a waiver of a similar or dissimilar provision or condition at the time or at any prior or subsequent time.

          **13.**    <u>Effect of Partial Invalidity</u>.  In the event that any provision or term of this Letter Agreement is held to be invalid, prohibited or unenforceable for any reason, such provision or term shall be deemed severed from this Letter Agreement, without invalidating the remaining provisions, which shall remain in full force and effect, provided that the severance of such provision or term would no render the remaining provisions inconsistent with the intent of the parties with regards to the matters contemplated under the Agreement.

          **14.**    <u>Enforceability and Liability of Intended Beneficiaries</u>.  The members of RBC Financial Group other than RBC are intended third-party beneficiaries of this Agreement and shall be entitled to enforce all of the terms and conditions of this Agreement.  Such intended beneficiaries hall not have any liability whatsoever in law or in equity for any act of omission of any party to this Agreement or such party's agents or subagents, and shall not be under any obligation to perform or carry out any duties unless otherwise agreed to in writing.

          **15.**    <u>Binding Effect; Assignment</u>.  This Letter Agreement and all rights and obligations hereunder shall be binding upon and inure to the benefit of any successors in interest or assigns of the Consultant or the Firm.  This Letter Agreement and the performance of any obligations hereunder may not be assigned, delegated or otherwise transferred by either party without the prior written consent of the other party.

          **16.**    <u>Entire Agreement</u>.  This Letter Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties, whether written or oral, relating to the same subject matter.  No modification, amendment or supplement to this Letter Agreement shall be effective for any purpose unless in writing and signed by each party.

          Please indicate your acceptance of the terms of this Letter Agreement by signing and returning to me a copy of this letter.

CONFIDENTIAL

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 7 of 8

Very truly yours,

By: _____
Angelo A. Burke
Managing Director, Human Resources

**ACCEPTED AND AGREED TO:**

**Risk Management Consulting Services, LLC**

By:   DAVID J. SELLERS
Print Name

Signature

CONSULTANT
Title

7 AUGUST 2006
Date

RBC_014282

Mr. David Sellers
**Risk Management Consulting Services, LLC**
August 2, 2006
Page 8 of 8

<u>APPENDIX A</u>

**Location:**            One Liberty Plaza, New York, NY

**Assignment: to develop Ratings Criteria Papers for the Us Public Sector issuers.**

**Description of Role:**  Consultant will work with Andrew Brown, Zahra Afkari and others from Group Risk Management to develop at least 4 Ratings Criteria Papers for the US Public Sector issuers.

CONFIDENTIAL                                                                    RBC_014283

# EXHIBIT D



**ROYAL BANK**
**OF CANADA**

One Liberty Plaza
165 Broadway
New York, NY 10006-1404
Telephone (212) 428-6200

December 20, 2006

Risk Management Consulting Services, LLC
Mr. David Sellers
24 East Prospect Street
Hopewell, NJ  08525
Tax Identification Number: <u>20-5184850</u>

**Risk Management Consulting Services, LLC Agreement for**
**<u>Additional Consulting Services</u>**

Dear David:

Reference is to the August 7, 2006 letter agreement between RBC Capital Markets Corp. ("RBCCMC" or the "Firm") and Risk Management Consulting Services, LLC (the "Consultant") (the "Consulting Agreement"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Consulting Agreement. When fully executed, this letter shall constitute an agreement to provide Additional Consulting Services under the Consulting Agreement. It is agreed as follows:

1. During the period commencing **November 7, 2006 through January 31, 2007** or until one of the parties terminates this letter agreement pursuant to Section 4 of the Consulting Agreement, the Consultant agrees to provide to RBCCMC and other members of the RBC Financial Group Additional Consulting Services described in **Appendix A attached** (the "Consulting Services"). Specific assignments shall be determined by and communicated to the Consultant by **Andrew Brown**, or such other person as may be designated by the Firm. It is understood and agreed that the Additional Consulting Services will be performed by **David Sellers**, or such other qualified individual able to perform the Additional Consulting Services in a professional manner conforming to generally accepted industry standards and practice as may be agreed to in writing by the Firm and the Consultant.

2. In consideration for Consulting Services, RBCCMC shall pay the Consultant a fee of **US$150** per hour for each hour in which Consulting Services are rendered (the "Consulting Fee"). It is agreed that the Consultant will invoice the Firm for the Consulting Fee every two weeks, in arrears. The invoices shall be payable by the Firm within thirty (30) days from the date they are submitted.

3. Except as expressly provided for herein, the terms under which the Additional Consulting Services are being rendered are governed by the Consulting

RBC_014272

Risk Management Consulting Services, LLC
December 20, 2006
Page 2 of 3

Agreement, as may be amended from time to time, which remains in full force and effect and is expressly incorporated herein.

Please indicate your acceptance of the terms of this letter agreement by signing and returning to me a copy of this letter.

Very truly yours,

By: _____
    Argyle Burke
    Managing Director

**ACCEPTED AND AGREED TO:**

Risk Management Consulting Services, LLC
Tax ID# REDACTED

By: _____
    David Sellers

Date: 20 DECEMBER 2006

RBC_014273