UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

DAVID SELLERS,

                                    Plaintiff,              12 Civ. 1577 (KBF)

               -against-

ROYAL BANK OF CANADA, RBC USA

HOLDCO CORPORATION, RBC CAPITAL

MARKETS CORPORATION, LLC,

AND JOHN DOES 1-5

                                    Defendants

-----------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12-9-13
```

# PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT


By:

David Sellers, *Pro Se*
24 East Prospect Street
Hopewell, New Jersey
08525
609-466-1354/ 609-468-8437

1

1. Standard of Review.

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Defendants have not and cannot support their extravagant claim that *"...there are no genuine issues of material fact..."* for any of Plaintiff's claims and, consequently, their Motion for Summary Judgment must be denied in its entirety.

2. Plaintiff Disputes Most of Defendants' Alleged "Undisputed Facts."

Plaintiff's RULE 56.1 RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS, which includes PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS REQUIRING THE DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT clearly show that numerous material facts relevant to the claims in this case are disputed.

The following response to specific arguments set forth in the DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT further demonstrates that the Defendants' motion fails to meet the minimum requirements for granting summary judgment according to Fed. R. Civ. P. 56(c).

Defendants' unsupported and misleading statement #1reads: *"This contention [that Plaintiff was misclassified] is based on Plaintiff's subjective belief that "what I did in corporate banking [was not] a project."* (MOL, p. 9, line(s) 10-11) Plaintiff responds: This statement is not supported by any facts. It is a prime example of how Defendants willfully quote out of context and otherwise misrepresent the Plaintiff's pleadings and testimony. In fact, Plaintiff articulates 26 *indicia* of employment in his Amended Complaint specifically related to his employment, mentioning the word "projects" only once. (Amended Complaint, pp. 10-13) Further, Plaintiff's deposition testimony unambiguously contradicts the Defendants' statement. When asked what led Plaintiff to believe he was an employee and not an independent contractor, he started his answer with: *"Many things differed and we know the devil is in the details. You know in the Amended Complaint, I state a number of indicia...of employment that I believe clearly applied in my case in corporate banking, but did not apply when I was in group risk."* The Courts have evolved three tests to be used in determining a worker's status: the common law test, the economic realities test and a hybrid test and Plaintiff is well aware of the factors considered by each test. (Sellers Dep. 92:13-93:22; 94:17-25. Sellers Aff. ¶18, 19.)

Defendants' unsupported and misleading statement #2 reads: *"Plaintiff is wrong. Plaintiff's (mis)conception of his independent contractor relationship ignores several key facts..."* (MOL, p. 9, line(s) 12-13) Plaintiff responds: Defendants start their Memo of Law with this rhetorical and gratuitous statement, which contributes nothing to an understanding of the relevant issues, followed by eleven (12) alleged "facts" (MOL, p. [2]-3) none of which withstands scrutiny, as follows:

- Response to Defendants' (1): The fact that Plaintiff *"...voluntarily formed a consulting company..."* is relatively immaterial for the purpose of establishing whether Plaintiff

was an employee or an independent contractor, which is why the Defendants make no attempt to establish the relevance.

- Response to Defendants' first (2): Defendants falsely assert that Plaintiff *"...renegotiated that contractual relationship **thirteen times**..."* (their emphasis) In fact, <u>during the period in question</u>, February 4, 2008 to February 27, 2009, the contractual relationship was extended six times, not thirteen. Their count misleadingly includes the period when Plaintiff worked in Defendants' Group Risk management, where his employment was properly classified and is not disputed.   <u>See also</u> Sellers Resp. ¶14.

- Response to Defendants' second (2): The fact that Plaintiff filed his tax returns as an independent contractor for tax years 2008-2009 says nothing about whether his employment was properly classified during those two years. <u>It is important to note that Defendants chose to hide from the Court the material fact that on April 11, 2012 Plaintiff filed an IRS Form SS-8 "Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding," which is pending.</u> How Plaintiff originally reported his income for 2008-2009 is only one of a number of inevitable effects of Defendants' misclassification of his employment status to begin with. The evidentiary value of the fact itself is undermined by the underlying premise -that Plaintiff's employment status was properly classified to begin with- that is in dispute. This point applies equally to every similarly flawed fact asserted below. <u>See</u> Sellers Response, ¶40, 41, 42, 43 and Add. Fact #6; Sellers Aff. Ex. 49.

- Response to Defendants' (3): Several points here: <u>First</u>, *"Plaintiff submitted monthly invoices to RBC for his services..."* because he was misclassified as an independent contractor to begin with, i.e., the asserted fact is based on a disputed premise. <u>Second</u>,

Plaintiff's invoices never referenced any *"applicable project."* In fact, Plaintiff's work could not in any meaningful way be distinguished from the work done by regular employees with comparable assignments. Third, Plaintiff was *"compensated outside the regular payroll process"* because, again, he was misclassified by RBC to begin with. Again, this "fact" is based on a disputed premise. See Sellers Response, ¶38, 43, 50 and Add. Fact #3, 12.

- Response to Defendants' (4): Plaintiff had no traditional title at RBC because the Bank did not recognize him as an employee, i.e., because they misclassified his employment status to begin with. See Sellers Response ¶ 44.

- Response to Defendants' (5): Plaintiff received no benefits from RBC because the Bank did not recognize him as an employee, i.e., because they misclassified his employment status to begin with. See Sellers Response ¶1. 49.

- Response to Defendants' (6): Plaintiff had no signing authority at RBC because the Bank did not recognize him as an employee, i.e., because they misclassified his employment status to begin with. Further, Defendants failed again to note a material fact: Plaintiff did have significant -arguably, in practical terms, greater- authority to negotiate the terms of financing agreements, and obtain required approvals, which were subsequently signed ("rubber stamped") by Defendant's regular employees. See Sellers Response ¶46, 47 and Add. Fact #35.

- Response to Defendants' (7): Plaintiff's LinkedIn page is irrelevant for the purpose of determining his employment status, and Defendants mislead the Court once again when they fail to note that Plaintiff did not have a LinkedIn page at any time during his tenure with RBC so this "fact" is irrelevant and immaterial. In discovery the Defendants

repeatedly objected to Plaintiff's document requests by arguing that the requested information was produced after Plaintiff's employment was terminated (February 27, 2009). <u>See</u> Sellers Response ¶39.

- <u>Response to Defendants' (8)</u>: Defendants have not and cannot disprove the fact that Plaintiff's hours in the office were indistinguishable from the hours worked by a regular employee doing comparable work and their assertion to the contrary is false. Plaintiff's invoices for the period February 4, 2008 – February 27, 2009, <u>all of which were approved by RBC's manager, Pat Shields,</u> provide irrefutable documentary evidence that during this period the Plaintiff worked and average of 45 hours weekly, over 95% of which time was in RBC's office. <u>Defendants attempt to hide this material evidence from the Court when they disclose only unattested and unsigned invoices which they copied from drafts that the Plaintiff e-mailed to himself, and not the approved copies they previously disclosed to the EEOC.</u> The undeniable fact that Plaintiff was provided his own office and every single tool and all supplies he needed to complete his assignments -same as a regular employee- is additional evidence that he was expected to be in his office during regular working hours. Given the time (4 hours) and expense (over $250 a month) of Plaintiff's daily commute to and from his RBC office it is reasonable to ask why he would work in RBC's office over 95% of the time if he was not required to do so. <u>See</u> Sellers Response ¶50 and Add. Fact 3, 12; Sellers Aff. ¶12, 16, 17 and Ex. 2, EEOC: 136-177.

- <u>Response to Defendants' (9)</u>: RBC could not give the Plaintiff a performance review because the Bank did not recognize him as an employee, i.e., because they misclassified his employment status to begin with. Here Defendants fail to acknowledge the material

fact that the <u>Plaintiff was assigned the task of doing a performance review of a regular full-time employee, a task reserved for employees.</u> See Sellers Response ¶36 and Add. Fact #27, 36; Sellers Aff. ¶27 and Ex. 59.

- <u>Response to Defendants' (10):</u> Several irrefutable facts served to completely eliminate the possibility of Plaintiff earning a "profit" or realizing a "loss" from his work at RBC, at least in any conventional business sense. The practical economics of Plaintiff's relationship with the Bank -how he was paid (salary equivalent), who paid for his office space and equipment and supplies required for his work (all RBC), and who was responsible for expenses (all RBC), and the fact that Plaintiff was not required to make any investment related to do his work- were indistinguishable from a regular employee and Defendants have not and cannot provided a scintilla of evidence to support their claim that Plaintiff *"...controlled his opportunity to make a profit or loss."* <u>See</u> Sellers Response Add. Fact ¶18; Sellers Aff. ¶14.

- <u>Response to Defendants' (11):</u> Finally, by their use of **bold type,** Defendants seek to exaggerate the significance of the fact that Plaintiff had a short-term consulting arrangement with another financial institution during the time he was working at RBC. In reality, this relationship is insignificant for the purpose of evaluating Plaintiff's employment classification: (1) this other contract entailed a total 37 hours over a three month period, i.e., an average three hours a week, all of which was done at Plaintiff's home on weekends and holidays, compared to <u>the 2,265.45 hours Plaintiff worked at RBC, which averages of over 45 hours a week, 95% of which was done in the RBC's offices. The 37 hours Plaintiff worked for Credit Suisse amounts to 1.7% of the hours he worked in RBC Corporate Banking.</u> (2) Contrary to the impression the Defendants seek

to leave, Credit Suisse Securities Americas LLC <u>is not in the same business</u> as the RBC

Corporate Banking Municipal Team and they were not competing for that business, i.e.,

<u>there was no conflict of interest between what he was actually doing</u>. (3) <u>Importantly,</u>

<u>RBC's managers approved Plaintiff's Credit Suisse work before he entered into the</u>

<u>contract.</u> (4) Defendants imply that there is a policy prohibiting employees from entering

into such agreements, but fail to produce any evidence that such a policy existed during

the relevant time period. (5) At the time, Plaintiff technically was not an employee, since

he was misclassified as an independent contractor, and therefore any policy governing

work with other financial institutions -if such a policy existed- would not have applied.

(6) Finally, in general, courts evaluate the totality of the circumstances surrounding a

worker's employment, i.e., all the conditions under which a person is working and in this

larger constellation of employment indicia this one other contract is relatively

immaterial. <u>See</u> Sellers Response ¶30, 31, 33, 35 and Add. Fact #29; Sellers Aff., 30, 32,

33.

<u>Summarizing, the facts asserted by the Defendants are not even close to "*overwhelming*</u>

<u>*and indisputable,"* as they claim.</u> (MOL, p. 2, line 8)

     In yet another unhelpful, rhetorical and gratuitous comment, Defendants assert that

"*Based on the fallacy that he was an "employee" Plaintiff then bootstraps [his] claims…"* and

that "*Each of these unconvincing claims fails as a matter of law for **multiple** reasons."* (MOL, p.

2, lines 10-14)

     In fact, each of their arguments fails for multiple reasons, as follows:

     <u>Defendants say:</u> "*Plaintiff's claims under the FLSA are time-barred."* (MOL, p. 2, line

16) <u>Plaintiff's responds:</u> The Defendants' time-barred argument previously failed before the

EEOC and they have neglected or failed to make this argument in previous pleadings before this Court. The Plaintiff has always claimed that the Defendants misclassification of his employment was willful and, therefore, a three year statute of limitation applies. Defendants now seek to resurrect this issue. It is telling that the Defendants' Statement of Fact and related documents provide no explanation or evidence (e.g., what dates are they using?). Importantly, by making this argument the Defendants breach the terms of the Tolling Agreement they signed on February 15, 2012, which was executed after the conclusion of the EEOC proceedings and tolled all of the Plaintiff's claims, not just ADEA related. (Sellers Response 86 and Add. Fact #2; Sellers Aff. Ex. 46) Finally, in the June 27, 2013 scheduling conference the Defendants questioned the timeliness of Plaintiff's claims and the Honorable Judge Forrest answered: *"But I think that since the Defendants' answer we have the complaint. I mean, you folks [Defendants] didn't move against any particular portion of the complaint and so we've got a live complaint."* (Docket 12-Civ-1577 No. 43, p. 8: 7-10)

Defendants say: *"Even if timely, the relevant factors under both FLSA and NYLL overwhelmingly weigh in favor of independent contractor status (as highlighted above)."* (MOL, p. 2, line 17-18) Plaintiff's responds: As the Plaintiff's comments here and in his Deposition, Affidavit and his Reply to the Defendants' Statements of Fact clearly demonstrate, numerous "facts" asserted by the Defendants fail as evidence of "independent contractor status."

### 3. Plaintiff Could Not Have Failed to Exhaust ERISA Administrative Remedies Because None Were Available to Misclassified Employees.

Plaintiff did not admit to failing -nor did he fail- to exhaust his administrative remedies and Defendants do not and cannot provide any evidence to support this claim, because none exists. With specific reference to ERISA, Defendants admit that their policies related only to

individuals they classified as employees. In other words, there were no "remedies," administrative or otherwise, *available for misclassified employees*, and therefore any claim for benefits would have served no useful purpose. Further, as explained in his deposition, Plaintiff did not realize the legal implications of the Defendants' misclassification until the weeks and months after his termination and undoubtedly a claim from a former misclassified employee would not have served any useful purpose at that time.

    The fact that RBC's ERISA plan excludes independent contractors is of no moment. A number of courts have ruled that employee misclassification is not determined by how employers and their benefit administrators label their workers. For example, in Vizcaino v. Microsoft, the Court reviewed the agreements signed by the workers when they were hired and concluded that the waivers of benefit provisions in the agreements were not controlling because they assumed the workers were independent contractors to begin with. The court applied the rule of *contra preferendum,* which provides that a document will be interpreted most strongly against its drafter, in this case that would be RBC. The court found that neither the agreements the workers signed when hired by Microsoft, nor the fact that Microsoft didn't consider them eligible participants and therefore did not communicate the terms of the plan to the workers, made the workers ineligible to participate in the plan. Rather, the Court found, the benefits administrator should have focused on the actual circumstances the workers' employment when making eligibility determinations and not the labeling of the workers by the agreements. The totality of the circumstances, i.e., all the conditions under which the Plaintiff was working, governs the characterization of his status as an employee or an independent contractor. *In Brock v. Superior Care, Inc.*, the Court stated that an employer's "self-serving" labeling of workers as independent contractors is not controlling.

### 4. Defendants' ADEA and NYHRL Independent Contractor Argument Failed Before the EEOC and Must Fail Again Here.

The Defendants' argument that *"Plaintiff's ADEA and NYHRL claims fail because those statutes do not apply to independent contractors"* previously failed to convince the EEOC, which is why the EEOC proceeded with its investigation after the Defendants made this argument to them. The EEOC specifically considered the question of the Plaintiff's employment classification, which could have been a "show-stopper." Defendants' newly resurrected argument must fail again because the underlying premise -that the Plaintiff's employment status was properly classified- remains in dispute, and because the Defendants have failed to make their argument until after the "eleventh hour." What the Honorable Judge said in the context of raising time-barred claims last June applies here equally: *"…you folks [Defendants] didn't move against any particular portion of the complaint and so we've got a live complaint."*

### 5. Defendants Retaliated Against the Plaintiff.

Several undeniable facts serve to dispel the Defendants' misleading statements concerning their February 5, 2010 retaliatory letter to the Plaintiff: (1) It is an established fact that RBC retaliated against the Plaintiff, not an allegation. In its May 16, 2011 letter the EEOC told Defendant RBC in no uncertain terms that their letter served to intimidate and was retaliation under Title VII of the Civil Rights Act of 1964. (2) The Defendants' hypothetical "reasonable person" in a position comparable to the Plaintiff's would likely be just as intimidated (as the Plaintiff was) by the possibility that a former employer could ruin them financially. (3) The Defendants' retaliatory letter was the source of considerable emotional distress for the Plaintiff and his family at that time and during the two ensuing years. (4) Although the Defendants informed the EEOC shortly thereafter that they waived their right to seek indemnification (i.e., retaliate further), the Plaintiff did not see this letter until two years later on

February 21, 2012, when the EEOC released its "charge file." (5) The Defendants' self-serving speculation about how a "reasonable person" would respond to their letter reveals that the Defendants still don't understand -or don't respect- the laws that protect employees from retaliation. (6) The only purpose of the Defendants letter was to threaten and intimidate the Plaintiff into dropping his claim, which is the employer's *raison d'etre* of retaliation and exactly what the law aims to prevent. (7) The Defendants' letter is retaliation, whether or not they follow through on their threat. As the Third Circuit stated, "an employer who retaliates cannot escape liability merely because the retaliation falls short of its intended result." (8) If the Defendants are not disabused of their notion that a retaliatory letter is harmless as long as they don't follow through, then they may believe they can get away with similar retaliation in the future. (9) The relevance and materiality of the Plaintiff's retaliation claim is only heightened by the Defendants' comments. (10) For these reasons the Defendants' Motion for Summary Judgment must not be granted.

### 6. Defendants' Argument, Legal Standard for Summary Judgment is Not Supported by the Asserted Facts or the Underlying Evidence.

The Defendants' cursory analysis of legal standards is rendered meaningless by their rhetorical conclusion that *"...Plaintiff has not -and cannot- proffer any evidence, other than his own self-serving and unsubstantiated allegations, to support his complaints... [and] ...Accordingly there are no genuine issues of material fact and Defendants' motion for summary judgment should be grated in its entirety."* If there was any truth in these statements whatsoever then a "reasonable person" would wonder how Plaintiff's Amended Complaint made it this far. Obviously, this complaint could not have survived without compelling evidence, notwithstanding the Defendants' best efforts to deny the Plaintiff access to the fact discovery he is entitled to under the Rules. The additional evidence set forth with the Plaintiff's Opposition to the Motion

for Summary Judgment, including his Reply to Defendants' Statement of Material Fact and its

supporting Affidavit and Plaintiff's Deposition, all serve to gainsay the Defendants extravagant

claims.

Numerous relevant and material facts supported by admissible evidence establish that

Plaintiff was misclassified as an independent contractor:

**7. Plaintiff Did Not Work *"...at his own convenience..."* or With Any More
Independence than a Regular Employee Doing Comparable Work. Plaintiff Was
Expected by Defendant RBC to Work Regular Business Hours in RBC's Office.**

(1) Plaintiff's invoices for the period February 4, 2008 – February 27, 2009, all of which

were approved by RBC's manager, Pat Shields, provide irrefutable evidence that during this

period the Plaintiff worked and average of 45 hours weekly, over 95% of which was in RBC's

office. (2) The undeniable fact that Plaintiff was provided his own office and every single tool

and all supplies he needed to complete his assignments -same as a regular employee- is

additional evidence that he was expected to be in his office during regular working hours. (3)

Plaintiff's commute averaged 4 hours daily or 980 hours (245 days in office x 4 hours) during

the relevant time period at a cost of over $250 a month. A reasonable person might ask why the

Plaintiff would spend this much time and expense going to and from RBC's office if he was not

required to do so. (4) Defendants have not and cannot disprove the fact that Plaintiff's hours in

the office were indistinguishable in any meaningful way from the hours worked by a regular

employee doing comparable work and their assertion to the contrary is false.

**8. Plaintiff Was Not *"...free to engage in work for other banks..."* Plaintiff Was Unable
to Engage in Any Significant Work Outside of Defendant RBC Because His Work at the
Bank Was a Full-Time Job.**

(1) The weekly average 45+ hours Plaintiff worked for RBC made this relationship a full-

time job. The Bureau of Labor Statistics defines full-time employment as 35 hours or more

weekly. (2) Adding 4 hours a day for commuting means that Plaintiff's work at RBC required an average daily commitment of 13 hours a day or 65 hours a week, allowing no time for any other material work commitments. (3) The 37 hours Plaintiff worked for Credit Suisse amounts to 1.7% of the 2,265.45 hours he worked in RBC Corporate Banking. (4) Contrary to the impression the Defendants seek to leave, Credit Suisse Securities Americas LLC is not in the same business as the RBC Corporate Banking Municipal Team and they were not competing for that business, i.e., there was no conflict of interest. (5) Importantly, RBC's managers approved Plaintiff's Credit Suisse work and confirmed there was no conflict before he entered into the contract. (6) Defendants imply that there is a policy prohibiting employees from entering into such agreements, but fail to produce any evidence that such a policy existed during the relevant time period. (7) At the time, Plaintiff technically was not an employee, since he was misclassified as an independent contractor, and therefore any policy governing work with other financial institutions -if such a policy existed- would not have applied. (8) During the relevant period Plaintiff did not advertise or actively seek other consulting work because he essentially had a full-time job with RBC and RBC's manager, Pat Shields, consistently confirmed his promise that Plaintiff's employment status would be regularized. (9) During the relevant period Plaintiff relied upon RBC for continued employment and his primary source of income, i.e., he was financially dependent upon RBC. His income from the one other consulting relationship amounted to 2.5% of his RBC income. (10) Finally, as previously noted, courts generally evaluate the totality of the circumstances surrounding a worker's employment, i.e., all the conditions under which a person is working, and Plaintiff's one consulting agreement outside of RBC is immaterial in this larger context.

**9. Plaintiff Did Not Control *"...his opportunity to make a profit or loss."* How Plaintiff Was Compensated by Defendant RBC, Including Reimbursement of All Expenses, and the Fact That Defendant RBC Provided Him with All of the Instrumentalities and Tools and Supplies Needed to do His Work Eliminated the Potential for "Profit or Loss."**

(1) Plaintiff's explicit understanding with RBC (Pat Shields) was that his position would typically require him to work in excess of 40 hours a week, as would be expected of a regular employee with similar responsibilities, and Plaintiff's approved invoices prove that in fact his average weekly hours exceeded 45. Plaintiff was paid an hourly rate. However, Plaintiff's contract with RBC capped the number of hours for which he would be paid at 40, eliminating profitability from the equation. In other words, the Plaintiff would not be paid more for his additional time, and there was no real potential for profit. Practically speaking, the Plaintiff was being paid a salary equivalent. (2) Plaintiff's office space and all tools and supplies required for his work were provided by RBC and Plaintiff made no -as in zero- investment in equipment or supplies, removing this factor from any profit/ loss equation. (3) All of Plaintiff's work-related travel expenses were reimbursed, removing this factor from any profit/ loss equation. (4) The economics of Plaintiff's relationship with the Bank, practically speaking in terms of how he was paid (salary equivalent), who paid for the instrumentalities of his work (RBC), and who was responsible for expenses (RBC), were indistinguishable from a regular employee and Defendants have not even attempted to argue otherwise. (5) Therefore, Defendants have not and cannot provide any evidence to support their claim that Plaintiff *"...controlled his opportunity to make a profit or loss."*

**10. Plaintiff Had No Higher a *"degree of skill,"* Nor Was He Able to Exercise Greater "Independent Initiative" Than a Regular Employee. RBC Exercised the Same Degree of Control and Supervision over Plaintiff's Work as They Did for Regular Employees With Similar Experience and Assignments.**

(1) Plaintiff's RBC supervisors were the same supervisors who supervised the work of regular employees doing comparable work. (2) RBC's supervisors exercised the same degree of control over the methods and strategy Plaintiff used to complete his assignments as they did for regular employees with a comparable level of experience, who were doing comparable work. (3) The skills Plaintiff used to complete his assignments were the same skills used by similarly experienced employees doing comparable work. (4) RBC's supervisors expected him to accept any assignments he was given, like an employee doing comparable work, and he never declined an assignment. (5) Plaintiff had access to and utilized the same RBC employee support staff used by regular employees with comparable assignments, including credit analysts, secretaries, administrative assistants and technical support, who were supervised by the same manager. (6) Defendants provide no evidence, apart from deposition quotes out of context, to support their claims regarding Plaintiff's "degree of skill" and "independent initiative."

### 11. The Duration of Plaintiff's Contractual Relationship is Not a Material Factor for the Purpose of Establishing Employment Classification.

Plaintiff's February 1, 2008 contract with RBC was expressly for the purpose of providing a "seamless" bridge between his work as an independent contractor in Group Risk and his employment in the Corporate Banking Municipal Finance team. RBC's manager Mr. Shields represented to the Plaintiff that this contract would serve the purpose of allowing the Plaintiff to begin working as a corporate banker in the Municipal Finance Team, performing all of the functions of a regular employee with comparable assignments and experience, for an interim period only until he had obtained all the necessary approvals and authorities for Plaintiff's employment status to be formalized, at which time the interim contract would be cancelled by mutual agreement. The expressed understanding was that this transition from *de facto* employment to formal employment would occur within the 3 month term of the February 1, 2008

Agreement. However, because RBC/ Mr. Shields never followed through on its promise of

employment, the Agreement was extended five times until the final expiration date of February

27, 2009. Prior to each extension, Plaintiff asked for and Mr. Shields unambiguously confirmed

his original promise to formalize Plaintiff's employment status. The "seamless" nature of

Agreement renewals that occurred during the period February 1, 2008 to February 27, 2009 only

served to reinforce Plaintiff's *de facto* status as an employee. In any case, during this period

Plaintiff's assignments and all of the *indicia* of employment remained constant.

<u>12. Plaintiff's Work at RBC Was Integral to RBC's Corporate Banking Municipal
Finance Business and Was Indistinguishable in Every Respect from the Work Done by
Employees With Comparable Assignments.</u>

(1) Plaintiff accepted the position in Corporate Banking based on RBC's (Mr. Shields')

representation that he was joining the Municipal Finance Team in a capacity no different from a

regular employee doing comparable work that was integral to RBC's business, and that his status

as a regular full-time employee would be formalized within the period of the first contract

extension. (2) RBC's manager Mr. Shields stated his expectation that, until Plaintiff's

employment status was formalized, he would conduct himself as if he was an employee with

comparable assignments, responsibilities and level of experience, and that he would present

himself to internal and external RBC constituencies alike as if he was a regular employee.

Numerous communications between Plaintiff and internal and external RBC constituencies

demonstrate that, in fact, Plaintiff conducted himself as an employee, and Defendants have

provided no evidence to the contrary. (3) <u>In fact, Plaintiff was assigned work that was integral to</u>

<u>RBC's regular municipal finance business, but never special projects or work that could be</u>

<u>distinguished in any meaningful way from work done by an employee.</u> Defendants have not even

attempted to distinguish Plaintiff's work from that of a regular employee, because they can't. (4)

RBC required Plaintiff to work in their New York office, initially in a cubicle and subsequently in an office designated for his exclusive use, during regular business hours (see RBC approved invoices and daily hours), indistinguishable from a regular employee doing work that was integral to RBC's business. Defendants have provided no evidence that distinguishes Plaintiff's hours in the office from the hours of a regular employee doing comparable work. (5) RBC's supervisors exercised the same degree of control over the methods and strategy Plaintiff used to complete his assignments as they did for regular employees doing work that was integral to RBC's business. Again, Defendants provide no evidence to support their argument to the contrary. (6) Plaintiff's RBC supervisors were the same supervisors who supervised the work of regular employees doing work that was integral to RBC's business, another irrefutable fact supporting Plaintiff's misclassification claims. (7) RBC's supervisors expected Plaintiff to accept any assignments he was given, like an employee doing work that was integral to RBC's business, and he never declined an assignment. (8) The skills Plaintiff used to complete his assignments were the same banking skills used by similarly experienced employees doing work that was integral to RBC's business. (9) RBC provided all the same instrumentalities, tools and materials he used to complete his assignments as they provided to employees doing work that was integral to RBC's business, including an office phone with RBC phone number, voicemail and voice recording, conference call subscription, Blackberry mobile phone, RBC e-mail address, laptop computer, permission to use printer and fax number, and all necessary office supplies and Plaintiff was required to supply nothing. Defendants have not identified one single tool or material necessary for completing his RBC assignments that Plaintiff was required to supply himself. (10) Plaintiff was not required to make any investment in or otherwise provide any of the tools and materials he used for his work for RBC, same as a regular employee doing work

that was integral to RBC's business. Defendants have not and cannot refute this fact. (11) From the start of his work in the Municipal Finance Team, Plaintiff was introduced to internal and external constituencies of RBC as a member of the "team" and a "colleague," no different from a regular employee doing work that was integral to RBC's business. E-mails from RBC's managers and others prove this fact. (12) <u>In all material respects the Plaintiff's work and personal conduct was no different from a regular employee doing work that was integral to RBC's business, and the Defendants have provided no material evidence to the contrary</u>.

### 13. Plaintiff Received No Fringe Benefits Because He Was Misclassified to Begin With.

The Defendants' attempt to use an inevitable effect of misclassification to argue that the Plaintiff was properly classified is fatally flawed because their conclusion is based on a disputed premise. Defendants fail to offer any material evidence to support their argument.

### 14. Plaintiff Was Not on RBC's Payroll Because He Was Misclassified to Begin With.

Again, the Defendants' attempt to use the effects of misclassification to argue that the Plaintiff was properly classified is fatally flawed because their conclusion is based on a disputed premise. (1) Tellingly, <u>Defendants hide from the Court the fact that the Plaintiff has been seeking an IRS determination of his RBC employment status.</u> In light of this fact, it seems disingenuous, if not dishonest, for the Defendants to state that *"Plaintiff's repeated sworn prior representations to the government undercut, to say the least, his claims now in this litigation..."* (2) If the fact of 1099 tax-treatment and no W-2 wage withholding determined that a worker was properly classified as independent contractor, then, by definition, no independent contractor could ever be misclassified. Of course, this is a tautological argument, and fatally flawed as such. (3) For this reason, none of the tests used by the Courts to determine whether a worker is properly classified, including common-law, economic reality or hybrid test, give any significant weight to the fact

19

that a worker receives a 1099 or that they report their income as a non-employee, because these facts may only be the inevitable byproduct of misclassification and because these and similar facts in and of themselves reveal nothing about the nature of the underlying employment relationship. (4) How a worker is paid and how he reports his income is determined by the contractual relationship between the worker and the employer, and the courts have found that even though a contract may state that a worker is an independent contractor, this is not sufficient to determine the worker's status. (5) Therefore, the Defendants' litany of facts related to Plaintiff's tax status, including 1099 treatment, Federal Employment ID number, no W-2 withholding, monthly invoicing, and reporting of income as a sole proprietor, is meaningless for the purpose of determining whether the Plaintiff was properly classified, or not.

In the end, Defendants cannot escape the overwhelming weight of the undisputed facts that demonstrate that he was misclassified under both the FLSA and NYLL as an independent contractor in 2008 and 2009.

### 15. Plaintiff Has Proved a *Prima Facie* Case of Age Discrimination.

As an initial matter, Defendants cannot use their misclassification of Plaintiff's employment status to argue that *"...Plaintiff may not pursue an age discrimination claim under the ADEA or NYSHRL because those laws only cover employees, not independent contractors."* Their argument is logically invalid because the underlying premise -that Plaintiff was correctly classified to begin with- remains in dispute. The Defendants argument that Plaintiff was not misclassified previously failed to stop the EEOC's investigation and this Court has yet to rule on the matter, another reason for denying the Defendants' Motion for Summary Judgment.

Plaintiff has proved a *prima facie* case of age discrimination under the Age Discrimination in Employment Act ("ADEA") using circumstantial evidence.  Federal courts

have relied on this jurisprudential tool to help victims of discrimination prove unlawful bias when there is no direct evidence of age discrimination, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 141 (2000) *citing U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, (1983). Circumstantial discrimination claims under the ADEA are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See also Mattera v. J.P. Morgan Chase Corp.,* 740 F. Supp. 2nd 561, 571 (S.D.N.Y. 2010).

To prove a *prima facie* case of age discrimination, the Plaintiff must show: "(1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced [an] adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of employment discrimination." *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 106, 107 (2d Cir.2010). Defendants do not contest that Plaintiff meets the first element of Plaintiff' *prima facie* case, that at the time of his employment on the Municipal Team, he was in the age protected group of employees forty years of age or older, (29 U.S.C. § 631(a)) and that Plaintiff was 56 years old when his employment was terminated. Defendants cannot dispute the third prong of a *prima facie* case, that Plaintiff experienced an adverse action at the hands of RBC, i.e., his employment was terminated at the end of February 2009. Termination is an obvious form of adverse employment action. *See, e.g., Gorzynski,* 596 F.3d at 107; *Hrisinko v. New York City Dep't of Educ.,* 369 Fed.Appx. 232, 235 (2d Cir.2010).

Defendants have contested both the second and fourth prong of Plaintiff' *prima facie* case, that is, Plaintiff's qualifications and that the termination took place under circumstances which give rise to an inference of discrimination. Defendants do not (presumably because such an assertion would fail) challenge Plaintiff' credentials for the position of the Head of Municipal

Finance.  Instead, RBC argues that there was no opening for that position and as a result there can be no discrimination in placing Mr. Sigmund, who was 23 years younger than Plaintiff, into that role.  Defendants argument fails for three reasons:  (1) the fact that the position of the Head of Municipal Finance was not posted, or that (presumably) no outside applicants were considered, has no bearing on the fact that Alexander Birr who held that position, was terminated in September of 2008 after 26 years with the Bank and four as the Team Head and that his termination left a vacancy on the Municipal Team; (2) denying the Plaintiff the opportunity to apply for the position because of age-based stereotypical presumption achieves the same discriminatory result as providing the opportunity to apply but not hiring for the same discriminatory reasons; and (3) Defendants cannot deny that it promoted Mr. Sigmund, age 34 at the time, into that position.

Plaintiff's claim pertains to his termination from the Bank at the end of February, 2009. Whether there were other openings is a factual issue about which RBC has not provided any data.  It is undisputed that Mr. Shields had a history of finding work for individuals on both short and long term bases in the Corporate Banking Group.  It is impossible to say that Plaintiff could not have been retained by the Municipal Finance Group once his State of California job was done, had he been younger.  He had an excellent work history with RBC and was clearly both talented and experienced in municipal finance banking.  Without information about available positions within Corporate Banking or other areas of the Bank, there is no evidence to support Defendants' claim that there was no available position for Plaintiff. The Defendant's undocumented claim that there were no open positions during Plaintiff's tenure at RBC does not at all "doom his claim."

Plaintiff has presented more than sufficient evidence to meet his minimal burden in proving that his termination took place under circumstances giving rise to age discrimination; that is, that age-based decisions were going on in the Corporate Banking Group. See *Shub v. Westchester Cmty. Coll.*, 556 F. Supp. 2d 227, 253 (S.D.N.Y. 2008) (burden upon the plaintiff to prove a *prima facie* case is minimal).

The Defendants have not and cannot deny that during the time Plaintiff worked in Corporate Banking (February 4, 2008 to February 27, 2009) there were three (3) individuals over the age of 50 reporting to Pat Shields and the employment of all three individuals was terminated within six months during this period: Betty Cohen, (DOB July 14, 1952; terminated August 29, 2008); Alex Birr, (DOB March 20, 1958; terminated October 29, 2008), the Plaintiff, (DOB August 14, 1952; terminated February 27, 2009). Importantly, the employment of the one remaining employee in the protected class (age 41 at the time) managed by Mr. Shields was terminated within the same period (Evan Glass, DOB January 10, 1967; terminated October 29, 2008).

Further, after Mr. Birr was terminated, his position was replaced by a relatively junior employee named Mr. Jake Sigmund who was 34 years old, over 20 years younger than both Mr. Birr and Plaintiff.  By all accounts, Mr. Sigmund had very little experience in the core responsibilities of this position: municipal finance credit underwriting, related client relationship management, and managing a team of banker's in this field.  His primary expertise was commercial real estate banking, which was not an emphasis of the Bank's municipal portfolio at that time.  Plaintiff believes that if the qualifications of Mr. Sigmund were evaluated at the time of his promotion in terms of the industry standard requirements for the position of head of the

Municipal Finance team, given the characteristics of RBC's portfolio at that time, Mr. Sigmund's experience would have been found inadequate for that job.

It makes no sense that Mr. Sigmund would have been placed into Mr. Birr's former position when Plaintiff was available to fill that job. Plaintiff had considerable experience in the field of municipal finance. In fact, he had devoted most of his career to various aspects of this field. Plaintiff also had extensive managerial experience, which Mr. Sigmund did not. These facts demonstrate that Plaintiff's employment status and termination arose out of a work environment where youth was prioritized over experience and business judgment, and older employees were terminated, while younger employees were promoted.

      16. The "Same Actor" Defense Must Fail.

Defendants argue that Mr. Shields was the same decision maker who hired Plaintiff and then discontinued his services. (Legal Memo at p. 17: line 10) The "same actor" defense is premised on an underlying rationale that "it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Ramos v. Marriott Int'l, Inc.,* 134 F. Supp. 2d 328, 345 (S.D.N.Y. 2001) *citing Watt v. New York Botanical Garden,* No. 98 Civ. 1095, 2000 WL 193626, at *7 (S.D.N.Y. Feb.16, 2000) (citations omitted).

The "same actor" defense, however, is only an initial presumption. It can be rebutted. An individual such as Mr. Shields may have many different motivations and pressures in the workplace to make employment decisions, including pressure from other employees who are consulted or who direct his or her decisions, ambivalence about a protected class, or a partial acceptance of individuals in a protected class if hired for a limited time period. The presumption permitted under the "same actor" defense should not be accepted as a substitute for a thorough

factual inquiry and should be denied by the Court as a reason for granting summary judgment. *See Copeland v. Rosen,* 38 F.Supp.2d 298, 305 (S.D.N.Y.1999); *Watt,* 2000 WL 193626, at *7.

RBC premises its "same actor" defense on the assumption that only Mr. Shields was involved in the so-called hiring and firing decisions pertaining to Plaintiff' employment. *See Campbell v. Alliance Nat'l Inc.,* 107 F.Sup.2d 234, 248-49 (S.D.N.Y. 2000). Yet, Defendants have not provided any documentary evidence which proves that Mr. Shields acted alone, rather than in conjunction with others in offering Plaintiff a position on the Municipal Finance Team, or in terminating his employment. The only evidence Defendants provide is Mr. Shields' Affidavit, which has yet to be tested in this Court. For example, Plaintiff was not offered a job with the Municipal Finance Team until after he interviewed with not only Mr. Shields, but Mr. Stephen Walker and Mr. Chris Hamel, both managing directors (the former as Head of Corporate Banking in the Bank's Toronto Head Office; the latter as Head of the Bank's Capital Markets subsidiary (RBCCM) in New York). Similarly, Mr. Shields could not have decided to terminate Plaintiff without the *de facto,* if not formal authority, and approval of at least Mr. Walker, his immediate superior, and other high level management employees at the Bank whose business would be affected. Perhaps one or more of these individuals wanted to hire Plaintiff and the others did not. In other words, only one employee of RBC has to have had bias against Plaintiff because of his age. And only one needed to feel similarly in making the decision to fire him. Here, there were likely multiple decision makers and Mr. Shields was only one. Such evidence would clearly rebut the "same actor" defense asserted by RBC.

Plaintiff claims that RBC (Mr. Shields) initially hired him for opportunistic reasons, including the lack of experience on the Municipal Finance Team during a challenging period, and then prior to each contract expiration date Mr. Shields (RBC) misled Plaintiff by confirming

his original promise to hire him, creating a false sense of job security, in order to discourage Plaintiff from seeking other more permanent employment, finally terminating his employment because of age bias. It is not at all "illogical" that Mr. Shields would initially hire the Plaintiff for opportunistic reasons, notwithstanding an age bias, and ultimately terminate his employment because of a "discriminatory animus."

Finally, concerning the Defendants' "same actor" defense, there is no logical basis for believing that an individual in a protected class is incapable of discriminating against other individuals in the same class. According to the Defendants' argument, an employer who wanted to fire all its protected workers based on stereotypical presumptions of age could easily evade any legal repercussions by making sure that the person "making the decision" was in the same protected class. If this is allowed by the court, then the ADEA's fundamental purpose is easily undermined by yet another technique for arbitraging laws against discrimination.

Especially in the absence of documentary evidence supporting the Defendants' claim, a trial is required to determine whether Mr. Shields hired and/or fired Plaintiff alone or in conjunction with other decision makers. For this reason, Defendants' Motion for Summary Judgment must be denied.

Finally here, Plaintiff was denied access to a fair discovery of the facts relevant to his claims because of the Defendants' abusive, tactical use of discovery.

### 17. Defendants Fail to Document Their Claim of Legitimate Non-Discriminatory Reasons for Terminating Plaintiff's Employment.

Here Defendant's support their assertions with inaccurate and misleading facts. (1) Defendants provide no documentary evidence to support their claim that the decision to terminate Plaintiff's employment was based on "...legitimate exercise of business judgment." The business judgment they describe would have been documented in business plans for

Corporate Banking, including budgets, and related e-mail and other communications, not a scintilla of which is offered as evidence. Instead, the Court is expected to rely entirely on a self-serving affidavit statement. (2) Likewise, Defendants offer no documentary evidence whatsoever of any "apparent friction" between Plaintiff and Mr. Sigmund, expecting instead that the Court will rely entirely on the same self-serving affidavit (affiant Mr. Shields). Plaintiff's own Deposition and Affidavit testimony gainsay Defendants vague claim. (3) Plaintiff's deposition unequivocally and unambiguously contradicts the claim that a "Vice President level...position [was] below Plaintiff's expectations and career growth." (4) It is significant to note that the first person hired as a Vice president after Plaintiff's termination was nearly 17 younger that Plaintiff, and not in the age protected class. (5) <u>The Defendants cannot escape these two facts: first, all Corporate Banking employees over the age of 40, including the Plaintiff, were terminated by Mr. Shields within a six month period (August 29, 2008 to February 27, 2009) and, second, a 32 year old employee with relatively little relevant experience was promoted over the Plaintiff to replace a 50+ years old employee as manager of the Municipal Finance Team.</u> (6) Defendants willfully misrepresent Plaintiff's testimony concerning the term "junior", in an attempt to mislead the Court, when they neglect this part of Plaintiff testimony: *"In theory they could hire somebody who is older than me who is, in fact, junior, <u>but that would not be likely. Junior people, if we're going to speak realistically, implies a younger person than me.</u>"* <u>See</u> Sellers Dep., 110:20-24. (7) Plaintiff' allegations regarding the termination of Mr. Birr (the former head of the Municipal Team) and the promotion of Mr. Sigmund is evidence of age discrimination more generally in RBC's Corporate Banking Group and evidence of an employer's mind set or motive upon which it bases its actions is relevant to support Plaintiff termination claim, even if outside the statute of limitations period. (8) The evidence does not support the Defendants' stated reasons for hiring

Mr. Sigmund or their reasons for not appointing Plaintiff to the position of Head of Municipal Finance. Defendants state that Mr. Sigmund was appointed because he had extensive real estate experience and because of his credit underwriting skills. However, underwriting new real estate based transactions in the municipal portfolio was not a priority in 2009 for RBC, or most other banks doing comparable business. And, the real estate related risk related portion of the portfolio was materially less than Defendants' assert, not 15-30%, but closer to 5%. Moreover, Plaintiff had far more experience that Mr. Sigmund in credit underwriting related to the types of transactions in the Municipal Team portfolio, and likely to be added. Plaintiff worked with Mr. Sigmund for four months, from October of 2008 through February of 2009. During that period of time, Mr. Sigmund frequently asked him to explain basic aspects of underwriting municipal credit risks. He even admitted that he needed coaching on many aspects of municipal finance, requiring Plaintiff to assist and mentor him in his new role. (9) There is no evidence whatsoever that there was no further work for Plaintiff in the Municipal Finance Team or the Corporate Banking Group, or that there were no other openings for Plaintiff within the Bank. In the absence of any evidentiary support for Defendants' actions, particularly after Mr. Shields repeatedly reassured Plaintiff that he would have a permanent position at the Bank, and the strong inference that may be taken from the termination of Mr. Birr and the replacement of his position with an unqualified much younger employee, and the termination of every other employee over the age of 40, including the Plaintiff, the Court must deny the Defendants' Motion for Summary Judgment.

### 18. Defendants' Retaliation Violated the Civil Rights Act of 1964 and Was by Definition an Adverse Action That Caused Plaintiff Emotional Distress.

(1) It is an established fact that RBC retaliated against the Plaintiff, not an allegation. (2) In its May 16, 2011 letter the EEOC told Defendant RBC in no uncertain terms that their letter

served to intimidate and was retaliation under Title VII of the Civil Rights Act of 1964. (3) The

Defendants' hypothetical "reasonable person" in a position comparable to the Plaintiff's would

likely be just as intimidated (as the Plaintiff was) by the possibility that a former employer could

ruin them financially. (3) The Defendants' retaliatory letter was the source of considerable

emotional distress for the Plaintiff and his family at that time and during the two ensuing years.

(4) Although the Defendants informed the EEOC shortly thereafter that they waived their right to

seek indemnification (i.e., retaliate further), the Plaintiff did not see this letter until two years

later on February 21, 2012, when the EEOC released its "charge file." (5) The Defendants' self-

serving speculation about how a "reasonable person" would respond to their letter reveals that

the Defendants still don't understand -or don't respect- the laws that protect employees from

retaliation. (6) The only purpose of the Defendants letter was to threaten and intimidate the

Plaintiff into dropping his claim, which is the employer's *raison d'etre* of retaliation and exactly

what the law aims to prevent. (7) The Defendants' letter is retaliation, whether or not they follow

through on their threat. (8) If the Court does not disabuse the Defendants of their notion that a

retaliatory letter is harmless ("is of no moment") as long as they don't follow through, then they

may believe they can get away with similar retaliation in the future. (9) The relevance and

materiality of the Plaintiff's retaliation claim is only heightened by the Defendants' comments.

(10) For these reasons the Defendants' Motion for Summary Judgment must not be granted.

### 19. Defendants Willfully Ignore the Plaintiff's Evidence of Emotional Distress.

(1) During the period of Plaintiff's unemployment since his termination by RBC, he has

suffered emotional distress caused by the premature ending of his career, loss of income and

savings, liquidation of retirement savings, and delayed payment of mortgage, property tax and

other bills, i.e., the tangible personal effects of the Plaintiff's actions. (2) Defendants' retaliation,

which violated the Civil Rights Act of 1966 according to the EEOC, and the ongoing implicit

threat of retaliation for the current litigation has been an additional source of emotional distress.

Any "reasonable person" would experience emotional distress if one of the world's largest

banks, facilitated by one of the largest employment law firms, threatened to ruin them

financially. (3) Defendants turn a deaf ear to Plaintiff's deposition testimony: *"Well when you

lose your job and your career is ended...and you lose your primary source of income, and...in

order to pay your bills, have to draw down your retirement funds and...you have all the financial

stress...that by definition causes emotional distress..."* Plaintiff offered just a few of the tangible

sources of stress, including *"...figuring out how to pay...monthly bills, figuring out how to pay a

mortgage, figuring out how to make the property tax payment quarterly..."* (4) Defendants cast a

blind eye to the tangible evidence as well. (5) The fact that Plaintiff did not seek medical

treatment for emotional distress is evidence only that he did not seek medical treatment for his

emotional distress, not that there was no emotional distress. Their argument here is merely

opportunistic. No doubt the Defendants would also argue that evidence of medical treatment for

emotional distress does not prove there was emotional distress. (6) Finally, clearly there is a

dispute over the question of emotional distress, a material fact, which Defendants' willful

ignorance fails to hide, another reason why the Court must deny their Motion for Summary

Judgment. See Sellers Dep., 119:7-122:11. See also Sellers Aff. Ex. 36, 49.

### 20. Defendants Fail to Prove There is No Evidence to Support an Award of Punitive Damages.

(1) The Plaintiff's inability to speak at his deposition of the evidence that would support

an award of punitive damages proves only that the Plaintiff acting *pro se* was not able to

confidently speak to the subject at that time, not that there is insufficient evidence to support an

award of punitive damages. (2) Once again, Defendants willfully misrepresent Plaintiff's

deposition testimony when they fail to mention that the *pro se* Plaintiff said he was unprepared at that moment to speak to punitive damages: <u>Defendants</u>: *"What conduct do you consider gives rise to punitive damages?"* <u>Plaintiff's reply</u>: *"I couldn't answer that off the top of my head...without doing some homework..."* <u>See</u> Sellers Dep., 166:24-167:10; 167:10-168:15. (3) At this time Plaintiff understands he is entitled to punitive damages under several laws, at least under the New York City Human Rights Law and Title VII of the Civil Rights Act of 1964, at a minimum for the Defendants' retaliation against Plaintiff's EEOC Charge.

<u>It is clear from the preceding and the Plaintiff's RULE 56.1 RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS, which includes PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS REQUIRING THE DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT that numerous material facts are disputed. For this reason, Plaintiff respectfully requests that the Court deny in its entirety the Defendants Motion for Summary Judgment.</u>

Dated: Hopewell, New Jersey

*DECEMBER 6, 2013*

David Sellers, *Pro Se*

David Sellers
24 East Prospect Street
Hopewell, New Jersey 08525
609-466-1354 (land);
609-468-8437 (mobile)
sellers.david@yahoo.com

December 7, 2013

**Via USPS PRIORITY MAIL**

United States District Court - Southern District of New York
Daniel Patrick Moynihan United States Courthouse
*Pro Se* Office
500 Pearl Street, Room 230
New York, New York
10007

**Re: David Sellers v. Royal Bank of Canada, RBC USA Holdco Corporation, RBC Capital Markets Corporation, LLC, and John Does 1-5   12-CV-1577 (KBF)**

Dear *Pro Se* Office:

Referring to the above-captioned Civil Action, please find one original and one copy of each of the following Documents:

- Plaintiff's OPPOSITION TO MOTION FOR SUMMARY JUDGMENT, dated December 6, 2013.
- Plaintiff's AFFIRMATION OF SERVICE, dated December 6, 2013 (revised).

Please note that Plaintiff intended and understood that the OPPOSITION TO MOTION document was in the package sent to your office and the Defendants' on Friday, December 6. However, it was inadvertently left out of those packages.

In case it is necessary, I have revised the original December 6 Affirmation of Service to reflect hand delivery of this document today to both the *Pro Se* office and the Defendants.

I apologize for any inconvenience.

Please contact me directly with any questions.

Thank you.

Sincerely,

David Sellers *(Pro Se)*
24 East Prospect Street
Hopewell, New Jersey
08525
609-466-1354 (land); 609-468-8437 (mobile)
sellers.david@yahoo.com