UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ‾JAN 0 8 2014

-------------------------------------------------------------------- X
                                           :

DAVID SELLERS,
                                           :

                     Plaintiff,          :              12 Civ. 1577 (KBF)
          -v-                    :
                                           :             MEMORANDUM
                                         :             DECISION & ORDER

THE ROYAL BANK OF CANADA, et al.,    :

                                      :

                    Defendants.     :
-------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      On March 5, 2012, plaintiff David Sellers filed a complaint against defendant

The Royal Bank of Canada alleging violations of the Fair Labor Standards Act

("FLSA"), the Employment Retirement Income Security Act of 1974 ("ERISA"), the

New York Labor Law ("NYLL"), the Age Discrimination in Employment Act

("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the New York

City Human Rights Law ("NYCHRL"), as well as emotional distress resulting from

those violations. (Complaint ¶¶ 14, 40, 62–66, ECF No 1.) On June 22, 2012,

plaintiff filed an amended complaint, which added further defendants. (ECF No. 3.)

On October 28, 2013, defendants moved for summary judgment. (ECF No. 76.) For

the following reasons, defendants' motion is GRANTED.

## I.    BACKGROUND

### A. Factual Background

      The following facts are undisputed, unless indicated otherwise. The Court

recites only those facts relevant to its decision.

In the summer of 2006, plaintiff formed a company called Risk Management

Consultant Services (LLC) ("RMCS") to provide consulting services related to

public-finance banking.  (Defs.' Rule 56.1 Statement of Undisputed Material Facts

("Defs.' 56.1") ¶ 5, ECF No. 78.)  Plaintiff is the owner and sole proprietor of RMCS.

(Id.)  Subsequently, RBC entered into a Consulting Agreement ("the Agreement")

with RMCS, dated August 7, 2006 and executed by plaintiff.  (Defs.' 56.1 ¶¶ 6–7.)

The Agreement contained an original term of three months, during which plaintiff

would be paid a consulting fee for services performed in RBC's Group Risk

Management group.  (Defs.' 56.1 ¶ 8.)  The Agreement also contained the following

language:

> During the Term, the Consultant will act as an independent contractor.  No
> employment relationship is intended or will exist between the consultant (or
> its employees or independent contractors) and RBC or any other member of
> the RB Financial Group by virtue of this Letter Agreement . . . .

(Defs.' 56.1 ¶ 9.)

Although the Agreement was for a term of three months, the parties

extended the Agreement seven additional times, through January 31, 2008.  (Defs.'

56.1 ¶ 12.)

In December 2007, Andrew Brown, who had engaged plaintiff, discussed the

possibility of him performing additional work for Patrick Shields, who headed the

Municipal Finance team in RBC's Corporate Banking group.  (Defs.' 56.1 ¶ 14.)  Mr.

Shields met with plaintiff in January 2008 to discuss the possibility of their working

together.  (Defs.' 56.1 ¶ 16.)  Mr. Shields was over 40 years old at the time and is 48

years old now; plaintiff was 55 years old at the time.  (Defs.' 56.1 ¶¶ 15, 17.)  Mr.

2

Shields decided to offer plaintiff an extension of his Consulting Agreement, which plaintiff accepted, in which plaintiff would provide support to Alex Birr, who reported to Mr. Shields at the time. (Defs.' 56.1 ¶ 19.)

Accordingly, RBC and RMCS negotiated a new addendum to the Consulting Agreement. (Defs.' 56.1 ¶ 20.) That addendum defined RMCS's new work assignment as "[a]ssist[ing] Alex Birr with Public Finance deal flow including screening new opportunities and preparing business and credit submissions." (Defs.' 56.1 ¶ 21.) The addendum also provided that "the terms under which the Additional Consulting Services are being rendered are governed by the Consulting Agreement . . . which remains in full force and effect and is expressly incorporated herein." (Defs.' 56.1 ¶ 22.)

The Court construes plaintiff's responses to defendants' Rule 56.1 Statement of Undisputed Facts liberally, as it must. See Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007). Nonetheless, as set forth in detail below, plaintiff does not dispute the vast majority of relevant facts presented by defendants.[1]

Mr. Shields made no concrete promises to plaintiff regarding future employment at RBC, and defendants never offered a specific employment position to plaintiff. (Defs.' 56.1 ¶ 23.) According to plaintiff, "Mr. Shields unambiguously represented to Plaintiff that his continued independent contractor status was an

---

[1] Throughout his pleadings, plaintiff makes the same claim—that he "was an employee, but for RBC's misclassification of his employment status." (See Pl.'s Rule 56.1 Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1") ¶ 23.) Even construed liberally, this statement is a legal conclusion, not a factual allegation. Therefore, the Court need not credit it as fact on a motion for summary judgment. See Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on . . . conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.") (emphasis added).

3

interim measure only and that he would be hired," and that he and defendants were "on plan for a permanent position." (Pl.'s Rule 56.1 Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1") ¶ 23, ECF No. 99.) However, plaintiff does not dispute that defendants never made a legally binding commitment to make plaintiff an employee or at any point gave more than a vague indication that this would occur. (See Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23 ("[I]t was just a matter of time, believed to be within that first contract period and I believe as I recall initially discussed to be within a matter of weeks . . . .").)

In a January 21, 2008 email to Stephen Walker, Mr. Shields's manager, plaintiff acknowledged that, under the extension of his contract, his "[s]ervices would be provided under contract with [RMCS], the 'Consultant' for [his] current Agreement with the Bank." (Defs.' 56.1 ¶ 25.) Plaintiff further acknowledged that the extension of the Agreement did not constitute any employment relationship with RBC, but expressed that his "hope [was] that this consulting engagement will lead to regular employment." (Defs.' 56.1 ¶ 25.)[2]

On February 12, 2008, plaintiff told a third party in an email that there was only a "possibility of permanent" employment, "depending on reorg., budget, etc." (Defs.' 56.1 ¶ 24.)

---

[2] Plaintiff claims that the terms of his email to Stephen Walker "were requested by Mr. Walker and outlined in advance by Mr. Shields," and that "[i]t would have been inappropriate under the circumstances for the Plaintiff to go directly to Mr. Shields' manager (Mr. Walker) without confirming Mr. Shields' interim plan." (Pl.'s 56.1 ¶ 25.) Plaintiff does not dispute that he sent the email in question and that it contained the acknowledgement in question.

4

RBC and plaintiff subsequently extended the Agreement five more times, including renegotiated terms, through February 27, 2009. (Defs.' 56.1 ¶ 26.) None of the agreement extensions was for more than three months. (Id.)

In April 2008, while still consulting with RBC's Municipal Finance group, plaintiff, through RMCS, entered into another consulting agreement with Credit Suisse Securities (USA) LLC, also a bank, to provide consulting services for a period of three months. (Defs.' 56.1 ¶ 3.) Plaintiff admits that he provided "consulting services to RBC and Credit Suisse Securities through RMCS at the same time in 2008." (Defs.' 56.1 ¶ 32 (emphasis added).) During the same period of time, plaintiff also provided services for other entities, including the City of Port Saint Lucie, the state of California, the University of Pittsburgh Medical Center, and the City of Harrisburg. (Defs.' 56.1 ¶ 57.)

Numerous undisputed facts illustrate various differences between plaintiff's position at RBC and that of full-time employees.

For example, plaintiff admits that he received no formal performance reviews and that he did not receive a paycheck while he was engaged with RBC. (Defs.' 56.1 ¶¶ 36–37.) Plaintiff submitted invoices for payment to RBC under the name of his consulting company, RMCS. (Defs.' 56.1 ¶ 38.) Plaintiff represented himself on his LinkedIn profile as a sole proprietor of RMCS, not as an employee of RBC. (Defs.' 56.1 ¶ 39.) Plaintiff filed tax returns as a sole proprietor in 2008, 2009, 2011, and 2012, and paid self-employment taxes in those years; he took favorable tax deductions that are not allowed for employees; and he had his own federal employee

5

ID number under the RMCS name. (Defs.' 56.1 ¶¶ 40–42.)[3]  Plaintiff had no formal job title at RBC, and received no business cards indicating that he was an employee. (Defs.' 56.1 ¶¶ 44–45.)

Plaintiff's schedule also differed from that of a regular full-time employee. Plaintiff took vacation and personal days at his own convenience, and wrote emails announcing his planned days off rather than providing advance notice; in one such email, he wrote, "As a consultant, I do not get any paid holidays or vacation days." (Defs.' 56.1 ¶ 51.)  Plaintiff claims that he was "expected to maintain the same schedule as a regular employee, including being in his office during regular business hours." (Pl.'s 56.1 ¶ 50 (emphasis added).)  But plaintiff does not dispute that he was not required to arrive or depart the office at any particular time, take lunch or rest breaks for prescribed time periods, or clock in or out. (Defs.' 56.1 ¶ 50.) Furthermore, it is undisputed that the other individuals involved with plaintiff's assignments—both RBC employees and third parties—worked during regular business hours. (Defs.' 56.1 ¶ 52.)

Despite these differences and despite his undisputed admissions to others of his independent contractor status, plaintiff alleges that "he performed in material respects no different from an employee with similar responsibilities." (See, e.g., Pl.'s 56.1 ¶¶ 36–42.)

---

[3] While plaintiff disputes none of these assertions, he does note that, on April 12, 2012, he filed an IRS Form SS-8 requesting "Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding." (See, e.g., Pl.'s 56.1 ¶¶ 40–42.)  On December 12, 2013, the IRS responded to that request, and determined that plaintiff "shall be found to be an independent contractor." (See Heckman Decl. Ex. A, at 1, ECF No. 103.)

In October 2008, Jake Sigmund, a full-time RBC employee, became the Director of Municipal Finance.  RBC did not post and plaintiff did not apply for the Director of Municipal Finance position.  (Defs.' 56.1 ¶¶ 60–61.)

As the term of the final Consulting Agreement extension neared its expiration date, Mr. Shields decided not to renew the Agreement.  (Defs.' 56.1 ¶ 68.) By February 10, 2009, plaintiff had been informed that the Agreement would be extended through the end of February and that he would not be given a position as a permanent employee thereafter.  (Defs.' 56.1 ¶ 73.)  Plaintiff expressed to Mr. Shields that he was "disappointed that I won't be offered a regular position after[]all."  (Id.)

On February 24, 2009, in an email to Mr. Shields, plaintiff wrote, "I suspect that many of these people (particularly clients) assume I am a regular employee and may be surprised to learn I was working as a consultant."  (Defs.' 56.1 ¶ 54.)

B. Procedural History

Plaintiff filed his complaint on March 5, 2012 (ECF No. 1), and amended his complaint to add further defendants on June 22, 2012 (ECF No. 3).  Plaintiff asserts two claims: first, misclassification of his status as an independent contractor in violation of the FLSA, ERISA, and NYLL; and, second, violation of the ADEA, NYSHRL, and NYCHRL by failing to promote him, terminating his employment, and threatening retaliation.  (Am. Compl. ¶¶ 14, 40.)

On October 28, 2013, defendants moved for summary judgment.  (ECF No. 76.)  That motion became fully briefed on December 20, 2013.  (ECF No. 101.)[4]

## II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment,"

[4] On January 6, 2014, plaintiff requested leave to file a sur-reply in opposition to defendants' reply, which the Court granted.  ("Pl.'s Sur-Reply," ECF No. 106.)  That sur-reply does not change the outcome of this motion.  The Court has not relied on the defendants' comparison chart in its decision. (See Pl.'s Sur-Reply 4–5.)  The Court has also reviewed plaintiff's numbered responses to defendants' reply, most of which are sweeping denials of defendants' position rather than factual disputes.  (See, e.g., Statements Nos. 1–6, 8, 17–18, 21–23.)  Plaintiff's other responses fail to raise a disputed issue of material fact for various reasons.  For example, as explained infra, the terminations of employees aged over 40 who reported to Mr. Shields have no bearing on plaintiff's own termination, even if they actually occurred.  (See Statement No. 14.)  Similarly, plaintiff's retaliation claim fails because no adverse action occurred, regardless of the contents of the EEOC letter.  (See Statements No. 15–16.) The IRS letter is also unnecessary for the Court to reach its decision.  (See Statements No. 19–20.)

8

because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

The Court must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest."

Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) (citations and internal quotation marks omitted). "Even a pro se plaintiff, however, cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint." Saldana v. Local 32B–32J Serv. Emps. Int'l Union, No. 03 Civ. 1853 (DF), 2005 WL 66895, at *2 (S.D.N.Y. 2005).

## III.  DISCUSSION

### A. Plaintiff's Independent Contractor Status

Most of plaintiff's claims depend on the assumption that he was an employee, not an independent contractor.  For the following reasons, there is no "genuine issue of material fact" as to whether plaintiff was an independent contractor rather than an employee. See Celotex, 477 U.S. at 323.

Courts in the Second Circuit apply the "economic realities test" when making the determination of whether an individual is an employee or an independent contractor under the FLSA. Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 141 (2d Cir. 2008); see also Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961) (explaining that "the economic reality . . . is to be the test of employment"). Employment is a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield, 537 F.3d at 141–42 (citing Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 n.1 (2d Cir. 1994)).

In evaluating misclassification claims under the FLSA, "[t]he ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for

themselves." Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988).  Five

factors are relevant to that analysis: "(1) the degree of control exercised by the

employer over the workers, (2) the workers' opportunity for profit or loss and their

investment in the business, (3) the degree of skill and independent initiative

required to perform the work, (4) the permanence or duration of the working

relationship, and (5) the extent to which the work is an integral part of the

employer's business." Id. at 1058–59 (citing United States v. Silk, 331 U.S. 704, 716

(1947)); see also, e.g., Schwind v. EW & Assocs., Inc., 357 F. Supp. 2d 691 (S.D.N.Y.

2005) (applying the five-factor test).

 For analogous claims under the New York Labor Law, "the critical inquiry in

determining whether an employment relationship exists pertains to the degree of

control exercised by the purported employer over the results produced or the means

used to achieve the results," rather than the economic reality of the situation.

Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198 (2003).  Five factors are relevant to

determining control: "whether the worker (1) worked at his/her own convenience; (2)

was free to engage in other employment; (3) received fringe benefits; (4) was on the

employer's payroll; and (5) was on a fixed schedule." Topo v. Dhir, No. 01 Civ.

10881 (PKC), 2004 WL 527051, at *316 (S.D.N.Y. Mar. 16, 2004) (citing Bynog, 1

N.Y.3d at 198).

 The NYLL Bynog analysis for employer status is "substantially similar" to

the FLSA Silk analysis. Hart v. Rick's Cabaret Intern., Inc., No. 09 Civ. 3043

(PAE), 2013 WL 4822199, at *16 (S.D.N.Y. Sept. 10, 2013) (internal quotation

marks and citation omitted).  The Court therefore considers the factors

simultaneously.  See Topo, 2004 WL 527051, at *3 ("There is general support for

giving FLSA and the New York Labor Law consistent interpretations.").

### 1.   The Degree of Control Exercised by Defendants

The undisputed facts show that defendants exercised a low "degree of control"

over plaintiff.  See Brock, 840 F.2d at 1058.  Plaintiff worked "at his own

convenience," Bynog, 1 N.Y.3d at 193: he was not required to arrive or depart the

office at any particular time, take lunch or rest breaks for prescribed time periods,

or clock in or out.  (Defs.' 56.1 ¶¶ 50.)  He took vacation and personal days at his

own convenience and wrote emails announcing his planned days off, in one case

even citing his status as a consultant.  (Defs.' 56.1 ¶ 51.)  See VTA Mgmt. Servs.,

Inc. v. United States, No. 01 Civ. 0145 (ARR), 2004 WL 3199677 (E.D.N.Y. Dec. 14,

2004) (explaining that the fact that an individual "could take time off without

approval" weighed in favor of contractor status).

Plaintiff claims that he was expected to maintain a fixed schedule, like a

regular employee.  (Pl.'s 56.1 ¶ 50; see also Pl.'s Opp. to Defs.' Mem. of L. in Supp. of

Mot. for Summ. J. ("Pl.'s Opp.") 13, ECF No. 97 (describing plaintiff's schedule in

RBC's office).)  However, "[e]ven independent contractors . . . are required to keep to

a schedule.  The fact that an independent contractor is required to be at a job . . . at

a certain time does not eliminate his status as an independent contractor."

Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012).

Furthermore, it is undisputed that the other individuals with whom plaintiff

interacted working during regular business hours. (Defs.' 56.1 ¶ 52.) Thus, even assuming that plaintiff was expected to work a particular schedule, "[i]t is in the very nature of [plaintiff's] work . . . that obliged [him] to work on certain days and at certain times." Johnson v. FedEx Home Delivery, No. 04 Civ. 4935 (JG), 2011 WL 6153425, at *14 (E.D.N.Y. Dec. 12, 2011).

### 2. Plaintiff's Opportunity for Profit or Loss and His Investment in the Business

Plaintiff was "free to engage in other employment." Bynog, 1 N.Y.3d at 198. While he was under contract with RBC, plaintiff, through his consulting company, RMCS, of which he was the owner and sole proprietor, simultaneously entered into another consulting agreement with another bank, Credit Suisse Securities. (Defs.' 56.1 ¶¶ 5, 34.)[5] Plaintiff admits that he simultaneously provided "consulting services" to both RBC and Credit Suisse. (Defs.' 56.1 ¶ 32 (emphasis added).) Plaintiff also provided services for various other entities during his engagement with RBC. (Defs.' 56.1 ¶ 57.) The fact that plaintiff was "free to engage in other employment" indicates that his position "was that of an independent contractor." Legeno v. Douglas Elliman, LLC, 311 F. App'x 403, 405 (2d Cir. 2009); see also Cannon v. Douglas Elliman, LLC, No. 06 Civ 7092 (NRB), 2007 WL 4358456, at *1 (S.D.N.Y. Dec. 10, 2007).

---

[5] RBC policy prohibits employees from working outside the Bank without express written permission. (Defs.' 56.1 ¶ 34.) The parties dispute whether plaintiff sought and/or received permission before entering another consulting agreement. (See Defs.' 56.1 ¶ 35; Pl.'s Opp. 14.) That dispute is immaterial to this decision; it is clear on the undisputed facts that plaintiff was free to engage in other employment and did so.

Plaintiff states that he worked 37 hours for Credit Suisse, equal to 1.7% of the 2,265.45 hours he worked for RBC's Corporate Banking group, and that he was "financially dependent upon RBC." (Pl.'s Opp. 14.) The comparison of the time spent on each contract is legally meaningless; the dispositive point is that plaintiff was, indeed, "free to engage in other employment." Legeno, 311 F. App'x at 405.

Because plaintiff was free to accept other employment and did so, he had a significant "opportunity for profit or loss" through his consulting company, RMCS. See Brock, 840 F.2d at 1058; see also Schwind, 357 F. Supp. 2d at 701 (explaining that where "plaintiff worked only for [defendant]" and "was precluded from other income," he had a low opportunity for profit or loss); Gustafson v. Bell Atl. Corp., 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) (finding that a chauffeur who formed a contracting company "for the sole purpose of serving [defendant]" had, unlike the instant situation, a "minimal opportunity for entrepreneurial profit and loss"). This factor weighs in favor of independent contractor status.[6]

### 3. The Degree of Skill and Independent Initiative Required to Perform the Work

Plaintiff operated with a high "degree of skill and independent initiative." Brock, 840 F.2d at 1058–59. He "assumed transactions of increasing complexity and importance for the bank over time, including relatively complex and sophisticated 'Pre-Paid Gas' financings and, most noteworthy, the . . . re-structuring of a large bank-syndicated liquidity and credit enhancement facility for the State of

---

[6] The Court acknowledges that plaintiff appears to have made minimal investment in defendants' business. (See Pl.'s Opp. 15.) Nonetheless, plaintiff did control his opportunity to make a profit or loss for his contracting company, RMCS, by deciding which contracting projects to take on.

14

California, the single most critical transaction for Corporate Banking at that time." (Am. Compl. ¶ 53.)

The Court is mindful that "the fact that workers are skilled is not itself indicative of independent contractor status." Brock, 840 F.2d at 1060. Indeed, plaintiff claims that, while he "was entrusted to operate with a degree of independence and responsibility," so were regular employees with comparable assignments and level of experience. (Defs.' 56.1 ¶ 30; Pl.'s 56.1 ¶ 30; see also Pl.'s Opp. 16 (comparing plaintiff's supervisors, skills, and assignments to those of employees).) However, plaintiff here "was responsible for . . . [a] major client[]." Schwind, 357 F. Supp. 2d at 702. In fact, plaintiff was responsible for what he states was "the single most critical transaction" for the Corporate Banking group. (Am. Compl. ¶ 53.)

That plaintiff operated with a high "degree of skill and independent initiative" does not weigh against a finding of independent contractor status. Brock, 840 F.2d at 1058–59; see also Tagare v. Nynex Network Sys. Co., 994 F. Supp. 149, 157 (S.D.N.Y. 1997) (finding the fact that a plaintiff "was hired for his specialized skills" to weigh in favor of an independent contractor status).

4. The Permanence or Duration of the Working Relationship

While plaintiff worked for RBC from 2006 to 2009, his position took the form of discrete, short-term contracts, none of which lasted more than three months. (Defs.' 56.1 ¶ 26.) Short-term contracts weigh in favor of an independent contractor status. See Clesi v. Zinc Corp., No. 01, 2001 WL 1223456, at *4 (N.D.N.Y. Oct. 11,

15

2001); DeSouza v. EGL Eagle Global Logistics LP, 596 F. Supp. 2d 456, 465 (D. Conn. 2009).

Plaintiff argues that his February 1, 2008 contract, which he admits was extended five times until it expired on February 27, 2009, was designed to be "a 'seamless' bridge between his work as an independent contractor . . . and his employment." (Pl.'s Opp. 16–17.)  According to plaintiff, Mr. Shields told him that his employment status would be formalized within three months.  (Id.; see also Pl.'s 56.1 ¶ 23.)  But plaintiff admits that "Mr. Shields never followed through on [RBC's] promise of employment"—that is, that he served as an independent contractor. (Pl.'s Opp. 17; see also Defs.' 56.1 ¶ 32.)  Five renewals of no more than three months each are indicia of an independent contractor status.  Courts have found even year-to-year contracts to weigh in favor of finding an independent contractor relationship.  See Clesi, 2001 WL 1223456, at *4; DeSouza, 596 F. Supp. 2d at 465.

### 5. The Extent to Which the Work is an Integral Part of the Employer's Business

Numerous undisputed facts show that plaintiff was not an "integral part of [his] employer's business."  See Brock, 840 F.2d at 1059.

For example, according to plaintiff's own testimony, while he worked on complex and sophisticated projects, defendants did not hire him for unique purposes.  Rather, RBC "needed an experienced banker," and plaintiff was such "an experienced banker."  (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)  Plaintiff's work was "interchangeable with the work of other" experienced bankers, Velu v. Velocity

16

Exp., Inc., 666. F. Supp. 2d 300, 307 (E.D.N.Y. 2009), and he was "replaceable" with those other bankers, Browning, 885 F. Supp. 2d at 610.

Plaintiff was not given a business card with a job title and had no authority to commit RBC's balance sheet, unlike corporate bankers. (Defs.' 56.1 ¶¶ 44–47.)[7] He also did not "receive[] fringe benefits." Bynog, 1 N.Y.3d at 198. Nor did plaintiff receive the "benefits of employment provided to employees doing comparable work." (Am. Compl. ¶ 14.) Specifically, plaintiff received no paid vacation days or sick days, nor a "flu shot" or other "typical HR type benefits." (Defs.' 56.1 ¶¶ 48–49.) See McNally v. Yarnall, 764 F. Supp. 838, 841, 953 (S.D.N.Y. 1991) (finding a plaintiff to be an independent contractor where he received no fringe benefits).

Finally, plaintiff was not "on [his] employer's payroll." Bynog, 1 N.Y.3d at 198. Plaintiff received 1099 forms from RBC and had his own federal Employer ID Number, and defendants did not withhold payroll or other employment-related taxes or issue W-2 forms to plaintiff. (Defs.' 56.1 ¶¶ 40, 42–43.) Plaintiff's tax treatment by defendants signifies that he was in fact an independent contractor. See Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 118 (2d Cir. 2000). Similarly, the fact that plaintiff certified to the government on his tax returns that he operated as a non-employee, enabling him to receive deductions otherwise unavailable to employees, weighs in favor of finding him to be a contractor. "[I]f a plaintiff signs a tax return 'under penalty of perjury' that declares independent contractor status, . . . such a tax return may significantly

---

[7] Plaintiff states that he did have certain privileges while at RBC that corporate bankers also have, including the authority to negotiate the terms of credit agreements that were later signed by regular employees. (Pl.'s 56.1 ¶¶ 46–47.)

impede the plaintiff's ability to claim employee status . . . ." <u>Deboissiere v.</u>
<u>American Modification Agency</u>, No. 09 Civ. 2316, 2010 WL 4340642, at *3 (E.D.N.Y.
Oct. 22, 2010).

Plaintiff invoiced RBC monthly on his own forms, directed how and to where
RBC should make payment, filed tax returns as a sole proprietor in 2008, 2009,
2011, and 2012, and paid self-employment taxes in those same years. (Defs.' 56.1
¶¶ 38, 40–41.) On every invoice that plaintiff submitted through RMCS, he
explicitly referred to the contracted "project" and the original August 7, 2006
Consulting Agreement. (Defs.' 56.1 ¶ 38; Shields Aff. Ex. B, ECF No. 84.) The fact
that plaintiff "invoiced payment from Defendant under the name of his business"
weighs in favor of independent contractor status. <u>Thompson v. DDB Needham</u>
<u>Chicago, Inc.</u>, No. 95-7114, 1996 WL 392165, at *6 (N.D. Ill. July 11, 1996).

Instead of contesting these facts, plaintiff asserts that his lack of benefits and
his tax treatment "did not in any way limit the Plaintiff's ability to function in
material respects same as an employee with similar responsibilities." (<u>See, e.g.</u>,
Pl.'s 56.1 ¶¶ 43–45; 48–49.) Plaintiff claims that he "was assigned work that was
integral to RBC's regular municipal finance business," rather than "special projects
or work that could be distinguished in any meaningful way from work done by an
employee." (Pl.'s Opp. 17.) However, plaintiff's say-so is insufficient to create a
genuine "issue of material fact." <u>See</u> <u>Celotex</u>, 477 U.S. at 323. The overwhelming
weight of the evidence above shows that he lacked the "traditional indicia of

employment" found in the case law.  McNally, 764 F. Supp. at 852.  Plaintiff was

not, as a matter of law, integral to defendants' business.

### B. Plaintiff's FLSA, NYLL, ERISA, ADEA, and NYSHRL Claims

As set forth above, the undisputed facts drive inexorably toward the

conclusion that plaintiff was an independent contractor rather than an employee.

That employment status precludes most of his claims.

Plaintiff first claims that he was misclassified as an independent contractor

rather than as an employee in violation of the FLSA and NYLL.  However, as the

foregoing analysis shows, plaintiff was indeed an independent contractor, whether

under the Silk "economic reality" test used by courts in the FLSA context, or under

the Bynog "control" test used by New York state courts in the NYLL context.

Plaintiff's first cause of action is dismissed.

Plaintiff's independent contractor status also precludes any cause of action

under ERISA.  See Nationwide Mut. Ins. Co. v. Mortensen, 606 F.3d 22, 32 (2d Cir.

2010) (finding that independent contractors did "not qualify as employees covered

by ERISA").  As a result, the Court need not reach the also potentially dispositive

issues of exhaustion and "eligible employees" within the meaning of RBC's benefit

plans.  (See Defs.' Mem. of L. in Supp. of Their Mot. for Summ. J. ("Defs.' Mot.") 14–

15, ECF No. 77.)  Plaintiff's ERISA claim therefore fails.

Finally, plaintiff's independent contractor status precludes any cause of

action related to age discrimination under the ADEA or NYSHRL.  See Legeno, 311

F. App'x at 405 ("[A]n independent contractor position is not covered by the ADEA .

. . .”); Lee v. Glessing, 51 F. App’x 31, 32 (2d Cir. 2002) (“New York’s Human Rights Law cover[s] only employees.”).  Those claims fail as well.[8]

## C.  Plaintiff’s NYCHRL Claim

Unlike the ADEA and NYSHRL, the NYCHRL, codified at N.Y.C. Administrative Code § 8-107, does protect independent contractors “if they are ‘natural persons’ who ‘carry out work in furtherance of an employer’s business enterprise.’”  See Fowler v. Scores Holding Co., 677 F. Supp. 2d 673, 680 (S.D.N.Y. 2009) (quoting NYCHRL  § 8-102(5)); see also O’Neill v. Atlantic Sec. Guards, Inc., 250 A.D.2d 493, 493 (N.Y. App. Div. 1998).  However, for the reasons set forth below, plaintiff’s NYCHRL claim fails.

The NYCHRL “prohibit[s] age discrimination in employment decisions.” Weiss v. JPMorgan Chase & Co., No. 06 Civ. 4402 (DLC), 2010 WL 114248, at *1 (quoting NYCHRL § 8-107(1)(a)).  Prohibited employment decisions are those in which age is “a motivating factor” in the employment decision.  See id. at *4; see also Colon v. Trump Intern. Hotel & Tower, No. 10 Civ. 4794 (JGK), 2011 WL 6092299, at *5 (S.D.N.Y. Dec. 7, 2011) (citing Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2008)).[9]

---

[8] Even if plaintiff were an employee under the ADEA and/or NYHRL, he cannot meet the burden of showing that “age was not just a motivating factor behind the adverse action, but rather the ‘but-for’ cause of it.”  Sotomayor v. City of New York, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009)).  For the same reasons as those set forth below with respect to plaintiff’s NYCHRL claim for age discrimination, he fails to show that age played any role in the failure to hire him as a full-time employee, let alone a “but-for” cause.  (See infra pp. 21–23.)  Plaintiff’s say-so that “[i]t makes no sense” for defendants to have hired Mr. Sigmund rather than him falls far short of the showing necessary to prevail under Gross.  (See Pl.’s Opp. 24.)
[9] The NYCHRL is “not equivalent to federal and state antidiscrimination laws,” Colon, 2011 WL 6092299, at *5, but is rather “a floor below which the City’s Human Rights law cannot fall,” Loeffler, 582 F.3d at 278.  Courts in this District therefore interpret the NYCHRL as subject to the

The Court evaluates plaintiff's NYCHRL age discrimination claim under the three-step burden-shifting analysis set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

> Under this familiar framework, the plaintiff bears the initial burden of proving a prima facie case by a preponderance of the evidence by establishing that: (1) he is a member of a protected class; (2) he was qualified for the position for which he applied; (3) he was denied the position; and (4) the denial occurred under circumstances giving rise to an inference of discrimination. Once a plaintiff alleges a prima facie case of discrimination, the burden of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for its decision not to hire the plaintiff. The burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is a pretext for an impermissible motivation.

<u>Ruszkowski v. Kaleida Health Sys.</u>, 422 F. App'x 58, 60 (2d Cir. 2011) (citations omitted).

Plaintiff's claim fails at the first step of the <u>McDonnell Douglas</u> analysis, because he has failed to allege a <u>prima facie</u> case of discrimination. Plaintiff essentially asserts that his contractor agreement was not renewed in February 2009, that he was not hired as the Director of Municipal Finance, that he was 56 to 57 years old at the time, and that Mr. Sigmund—who was 34 years old—was hired for that position. (Pl.'s Opp. 21–23; Am. Compl. ¶ 48.) That is not enough. Plaintiff's say-so that "[i]t makes no sense" for defendants to have hired Mr. Sigmund rather than him (Pl.'s Opp. 24) does not make their decision a discriminatory one; he fails to provide any evidence whatsoever that age was a

---

"motivating factor" analysis that predated <u>Gross</u> rather than the <u>Gross</u> "but-for" analysis. <u>See</u> Weiss, 2010 WL 114248, at *1; <u>Colon</u>, 2011 WL 6092299, at *5. In this case, the Court need not elaborate on that issue any further. Because the <u>Gross</u> but-for standard is a <u>more</u> challenging one for plaintiff to meet, his claims would surely fail under the but-for standard if they fail under the more forgiving motivating-factor standard.

"motivating factor" in defendants' decision. Weiss, 2010 WL 114248, at *4. Instead, plaintiff has "offer[ed] purely conclusory allegations of discrimination, absent any concrete particulars." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).[10] The termination of other individuals within the protected age class who worked for RBC and reported to Mr. Shields (see Pl.'s Opp. 23) does not create an issue of fact with respect to plaintiff. See Rommage v. MTA Long Island Rail Road, No. 08 Civ. 836 (DLI), 2010 WL 4038754, at *9 (E.D.N.Y. Sept. 30, 2010).

Rather, the undisputed facts weigh heavily against finding an "inference of discrimination." Ruszkowski, 422 F. App'x at 60. For example, Mr. Shields, who failed to hire plaintiff and failed to renew his independent contractor arrangement with RBC, was himself over 40 years old at the time in question. (Defs.' 56.1 ¶ 15.) See Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP, 869 F. Supp. 2d 378, 395 (S.D.N.Y. 2012) (finding that "no inference of age . . . discrimination can be drawn" where the plaintiff's supervisor was "within the same protected classes as the Plaintiff"); Davis v. Peake, No. 08 Civ. 3570 (KTD), 2011 WL 4407551, at *6 (S.D.N.Y. Sept. 22, 2011), aff'd, 505 F. App'x 67 (2d Cir. 2012) (same). Mr. Shields was also the same person who initially engaged plaintiff through RMCS in February 2008 and renewed his contract five times thereafter. (Defs.' 56.1 ¶¶ 19, 26.) "When the person who made the decision to hire plaintiff is the same person

---

[10] Plaintiff mischaracterizes the record, stating that defendants "den[ied him] the opportunity to apply for the position" of Director of Municipal Finance to which it hired Mr. Sigmund. (Pl.'s Opp. 22.) However, plaintiff did not attempt to apply for the position—nor could he, because RBC did not post it. (Defs.' 56.1 ¶¶ 60–61.) Perhaps plaintiff's complaint is that defendants declined to post the position due to age-based animus—but defendants did not post the position at all, whether to individuals within the protected class or those outside it. Plaintiff fails to raise an "inference of discrimination" on these facts. Ruszkowski, 422 F. App'x at 60.

who made the decision to fire plaintiff, it is difficult to impute an invidious motivation that would be inconsistent with the decision to hire." Velasquez v. Goldwater Memorial Hosp., 88 F. Supp. 2d 257, 263 (S.D.N.Y. 2000).

Plaintiff fails to allege a prima facie case of age discrimination under the NYCHRL. Thus, the Court does not reach the also potentially dispositive second and third steps of the McDonnell Douglas burden-shifting analysis. (See Defs.' Mot. 18–21.) Plaintiff's age discrimination claim is dismissed.

D. Plaintiff's Retaliation Claim

Plaintiff's retaliation claim under the NYCHRL is also evaluated under the same McDonnell Douglas burden-shifting framework. Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012). Plaintiff must initially prove a prima facie case that "(1) [he] engaged in protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action." Id.

Plaintiff hinges his retaliation claim on RBC's February 5, 2010 letter to RMCS. (Am. Compl. ¶ 42.) RBC noted that plaintiff had filed a charge with the Equal Employment Opportunity Commission (EEOC) and stated that it reserved the right to seek indemnification for costs and fees associated with defending the EEOC charge, in accordance with the independent contractor agreement between plaintiff and defendants. (Defs.' 56.1 ¶ 82.)[11] That letter does not constitute an adverse action by defendants. (Defendants had declined to renew his contractor

---

[11] On June 28, 2011, RBC withdrew its request for reimbursement for those costs. (Defs.' 56.1 ¶ 83.)

arrangement one year earlier, in February 2009. (Defs.' 56.1 ¶ 73.))
Notwithstanding his receipt of that letter, plaintiff continued to pursue his EEOC
charge and ultimately filed his complaint in the instant case. (Defs.' 56.1 ¶¶ 85–87.)
See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) ("[A] plaintiff
must show that a reasonable employee would have found the challenged action
materially adverse, which in this context means it well might have dissuaded a
reasonable worker from making or supporting a charge of discrimination.") (internal
quotation marks and citations omitted).[12]

Because plaintiff alleges no prima facie case of retaliation, that claim is
dismissed. The Court need not reach the second and third steps of the McDonnell
Douglas analysis.

## IV.   CONCLUSION

No genuine issue of material fact exists as to whether plaintiff was an
independent contractor rather than an employee. Thus, plaintiff's misclassification
claims under the FLSA and NYLL fail as a matter of law. Because he was properly
classified as an independent contractor, plaintiff's ERISA and age discrimination
claims pursuant to the ADEA and NYSHRL also fail. On the undisputed facts,
plaintiff also fails to allege a prima facie case of age discrimination or retaliation
under the NYCHRL.

---

[12] It is immaterial that a May 16, 2011 EEOC letter stated that defendants' letter constituted
retaliation. (See Pl.'s Opp. 28–29.) That letter does not warrant deference by the Court. See Daigle
v. West, 225 F. Supp. 2d 235, 247 (N.D.N.Y. 2002) (explaining that the EEOC "cannot usurp the
judiciary's role in determining whether there is a genuine issue of material fact").

Accordingly, defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to close the motion at ECF No. 76 and to terminate this action.

SO ORDERED.

Dated:        New York, New York
              January 8, 2014

_____
              KATHERINE B. FORREST
              United States District Judge

CC:
David Sellers
24 East Prospect Street
Hopewell, NJ 08525